# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

## PEOPLE v TANNER

Docket No. 146211. Argued November 6, 2013 (Calendar No. 7). Decided June 23, 2014.

George R. Tanner was charged with open murder, MCL 750.316, and mutilation of a dead body, MCL 750.160, in the Livingston Circuit Court. After his arrest, he was taken to jail and read his rights under *Miranda v Arizona*, 384 US 436 (1966). Defendant invoked his right to counsel and questioning ceased. The next day, while speaking with a jail psychologist, defendant stated that he wanted to "get something off of his chest." The psychologist informed jail staff of defendant's request. The jail administrator then spoke with defendant. Defendant told the administrator that he wanted to speak with someone about his case and asked if the administrator could obtain an attorney for him. The administrator stated that he could not provide an attorney for defendant, but could contact the police officers who were handling the case. Defendant agreed. The administrator then contacted both the police and the prosecutor. The prosecutor apparently informed the court of defendant's request for an attorney, and the court sent an attorney to the jail. After the attorney and the police officers arrived at the jail, the jail administrator took the police officers to speak with defendant and asked the attorney to wait in the jail lobby while the officers determined defendant's intentions. Defendant was again read his *Miranda* rights, which he waived without again requesting an attorney and without being made aware of the attorney's presence at the jail. Defendant then made incriminating statements concerning his involvement in the murder. Defense counsel moved to suppress the statements, and the court, David J. Reader, J., granted the motion. The prosecution sought leave to appeal. The Court of Appeals denied the application. The prosecution then sought leave to appeal in the Supreme Court, which granted the application. 493 Mich 958 (2013).

In an opinion by Justice MARKMAN, joined by Chief Justice YOUNG and Justices KELLY, ZAHRA, and VIVIANO, the Supreme Court *held*:

Once it is determined that a suspect's decision not to rely on his or her rights was uncoerced, that at all times the suspect knew he or she could stand mute and request a lawyer, and that the suspect was aware of the state's intent to use the suspect's statements to secure a conviction, the analysis is complete and a waiver of those rights is valid as a matter of law, overruling *People v Bender*, 452 Mich 594 (1996).

1. Under the Fifth Amendment of the United States Constitution and Article 1, § 17 of Michigan's 1963 Constitution, no person shall be compelled in any criminal case to be a witness

against him or herself. In *Miranda*, the United States Supreme Court held that the accused must be given a series of warnings before being subjected to custodial interrogation in order to protect the constitutional right against self-incrimination. A suspect's waiver of the *Miranda* rights must be made voluntarily, intelligently, and knowingly.

2. In *Moran v Burbine*, 475 US 412 (1986), the United States Supreme Court held that the failure of the police to inform a suspect of the efforts of an attorney to reach the suspect does not deprive the suspect of his or her right to counsel or otherwise invalidate a *Miranda* waiver. Michigan's Supreme Court reached a different conclusion in *Bender*, holding that for a suspect's *Miranda* waiver to be made knowingly and intelligently, the police must promptly inform the suspect that an attorney is available when that attorney has made contact with them. Article 1, § 17 of Michigan's 1963 Constitution concerns compelled statements. At the time of the Constitution's ratification, the word "compelled" was commonly understood to refer to the use of coercion, violence, force, or pressure. Accordingly, Article 1, § 17 can be reasonably understood to protect a suspect from the use of his or her involuntary incriminating statements. The language of Article 1, § 17 does not support the decision reached in *Bender*, which pertained not to whether a statement was made voluntarily, but whether it was made knowingly. The lead and majority opinions in *Bender* engaged in an unfounded creation of constitutional rights.

3. Prior Michigan caselaw did not foreshadow or otherwise provide support for *Bender*'s per se exclusionary rule. Before *Bender*, the Michigan Supreme Court examined the effect of an attorney's attempts to contact a suspect on the admissibility of the suspect's confession in *People v Cavanaugh*, 246 Mich 680 (1929), and *People v Wright*, 441 Mich 140 (1992). Neither decision supported *Bender*'s assertion that Michigan courts have historically interpreted Michigan's Self-Incrimination Clause to provide criminal suspects with greater protections than those afforded by the Fifth Amendment. Rather, under Michigan law before *Miranda*, voluntariness constituted the sole criterion for a confession to be admissible under either the Due Process Clause or Michigan's Self-Incrimination Clause.

4. Although Michigan's Supreme Court need not interpret a provision of the Michigan Constitution in the same manner as a similar or identical federal constitutional provision, the United States Supreme Court's interpretation of the Self-Incrimination Clause of the Fifth Amendment in *Moran* constitutes the proper interpretation of Article I, § 17 as well. Full comprehension of *Miranda* rights is sufficient to dispel whatever coercion is inherent in the interrogation process, and the waiver of those rights cannot be affected by events that are unknown and unperceived, such as the fact that an attorney is available to offer assistance.

5. The application of stare decisis is generally the preferred course, but the Court is not constrained to follow precedent when governing decisions are "unworkable or []badly reasoned." Overruling *Bender* would not produce practical real-world dislocations, and less injury would result from overruling it than from maintaining it.

6. In this case, defendant was read his *Miranda* rights and invoked his right to counsel, but then reinitiated contact with the police when he indicated that he wanted to "get something off of his chest." He was again afforded his *Miranda* rights, and waived them, choosing not to reassert his right to counsel. Defendant's lack of awareness of the appointed attorney's presence

at the jail did not invalidate his *Miranda* waiver. Therefore, the trial court erred by suppressing defendant's incriminating statements.

Reversed and remanded.

Justice CAVANAGH, dissenting, believed that *Bender* correctly determined that Article 1, § 17 of the Michigan Constitution provides greater protection than its federal counterpart, requiring the police to inform the suspect when an attorney is immediately available to consult with him or her. The majority improperly rooted its contrary conclusion in a hyper-textualist analysis of the word "compelled." In 1929, in *Cavanaugh*, the Michigan Supreme Court ruled that holding an accused incommunicable was forbidden under the laws of this state, foreshadowing *Miranda*'s understanding of the nature of the right protected by the constitutional guarantee that a person will not be compelled to be a witness against him or herself. Although *Cavanaugh* used terminology addressing whether the accused's statement was voluntary, the *Cavanaugh* analysis was consistent with *Miranda*'s knowing-and-intelligent-waivers analysis, indicating that the Michigan Supreme Court did not interpret the Michigan Constitution to prohibit the use of only those confessions obtained through the use of physical force or cruel treatment. The majority's decision ignores the jurisprudential history of the Court embodied in *Cavanaugh* and continued in *Bender* and *Wright*. Further, under Article 1, § 20 of Michigan's 1963 Constitution, the accused has the right to the assistance of counsel in every criminal prosecution, including the specific right to be informed of an attorney's attempts to contact the accused. A defendant cannot waive the right to speak with an attorney who is immediately available and trying to contact him when he is unaware that the attorney is available and trying to contact him. *Bender* reached the correct result, provided a practical and workable rule, and should have been upheld under the doctrine of stare decisis.

Justice MCCORMACK, dissenting, agreed with Justice CAVANAGH that the *Bender* rule was grounded in Article I, § 17 of the Michigan Constitution with its jurisprudential roots set in *Cavanaugh*, and declined to join the majority's decision, which improperly reached beyond the facts of the case to overrule *Bender*'s settled and sound precedent. Although the fractured treatment of this issue in *Bender* was dissatisfying, none of *Bender*'s shortcomings were sufficient to undermine the substantive integrity of its conclusion or render it wrongly decided. Nor did any other consideration favor disruption of the *Bender* precedent. To the contrary, the facts of this case counseled further against that course of action, as the defendant here, unlike the defendants in *Bender*, made his incriminating statements only after he repeatedly expressed his desire for counsel, but to no avail. The defendant's frustrated attempts to invoke his right to counsel plainly implicated *Cavanaugh*, which persisted regardless of whether *Bender* was overruled. This case thus did not implicate the majority's core concerns with *Bender*, and overruling that precedent did little to resolve whether the defendant's incriminating statements should be suppressed.

©2014 State of Michigan

# Opinion

| Chief Justice: | Justices: |
|---|---|
| Robert P. Young, Jr. | Michael F. Cavanagh |
| | Stephen J. Markman |
| | Mary Beth Kelly |
| | Brian K. Zahra |
| | Bridget M. McCormack |
| | David F. Viviano |

FILED June 23, 2014

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v                                     No. 146211

GEORGE ROBERT TANNER,

      Defendant-Appellee.

BEFORE THE ENTIRE BENCH

MARKMAN, J.

      This Court granted leave to appeal to consider whether the rule announced in *People v Bender*, 452 Mich 594; 551 NW2d 71 (1996), should be maintained. *Bender* requires police officers to promptly inform a suspect facing custodial interrogation that an attorney is available when that attorney attempts to contact the suspect. If the officers fail to do so, any statements made by the suspect, including voluntary statements given by the suspect with full knowledge of his *Miranda* rights,[1] are rendered inadmissible. Because

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

there is nothing in this state's Constitution to support that rule, we respectfully conclude that *Bender* was wrongly decided and that it must be overruled. We therefore reverse the trial court's suppression of certain incriminating statements made by defendant, which suppression was justified solely on the grounds of *Bender*, and remand to the trial court for further proceedings consistent with this opinion.

## I. FACTS

Defendant George Tanner was arrested for murder and taken to jail on October 17, 2011. He was read his *Miranda* rights, and when police officers attempted to interview defendant at the jail, he invoked his right to counsel. As a result, the officers informed defendant that he would have to reinitiate contact if he subsequently changed his mind and wished to speak to them. The next day, while a psychologist employed by the jail to interview inmates was speaking with defendant, he said that he wanted to "get something off his chest." The psychologist told defendant that he should not further discuss the case with her, that he might wish to speak to an attorney, and that she could make arrangements for him to speak to the police officers. Defendant again stated that he wanted to "get things off his chest," so the psychologist told defendant that she would inform jail staff of his request. She then contacted the jail administrator and informed him that defendant wished to speak to police officers about his case.

The administrator spoke with defendant, told him that the psychologist had indicated that he wanted to "get something off his chest," and inquired whether he still wished to speak to someone about his case. Defendant replied "yes" and asked if the administrator could obtain an attorney for him. The administrator responded that he

could not, because this was not his role, but explained that he could contact the police officers who were handling the case. Defendant replied that this would be fine, and the administrator contacted the officers. The administrator also called the prosecutor, who advised him that the court would appoint an attorney for defendant should he request one. The prosecutor apparently informed the court of defendant's request, as a result of which an attorney was sent to the jail.

One of the police officers testified that he was contacted by the administrator and apprised that defendant might now be amenable to speaking with the officers. The police officer further testified that he confirmed with the administrator that defendant had not requested that an attorney be present during the interview, and that the administrator believed an attorney had been appointed merely as a contingency in the event defendant sought an attorney during the interview. Subsequently, both the police officers and an attorney appeared at the jail. Apparently unsure of his role, the attorney asked the officers and the administrator if they knew why he was there. The administrator responded and told him to wait in the jail lobby while he took the officers back to speak with defendant and determine his intentions.

Defendant was again read his *Miranda* rights, which he waived this time without requesting an attorney and without being made aware of the attorney's presence. The administrator then instructed the attorney that he could leave. Defendant shortly thereafter made incriminating statements concerning his involvement in the murder. He was eventually charged with open murder, MCL 750.316, and mutilation of a dead body, MCL 750.160. Defendant was bound over to circuit court following a preliminary examination. During this process, defense counsel filed a motion to suppress defendant's

3

statement to the police, alleging that because he had not been informed that an attorney had been appointed for him before his interrogation, his *Miranda* waiver was invalid under this Court's decision in *Bender*. A hearing was held on October 12, 2011, after which the trial court suppressed defendant's statement. The court determined that defendant had requested an attorney at his October 17, 2011 interrogation, but that he had affirmatively reinitiated contact with police officers on October 18, 2011, without reasserting his right to counsel. However, it also determined that defendant's statement required suppression under *Bender*, because the police officers had failed to inform him that an attorney was present at the jail and had established contact with the officers.

The prosecutor filed an application for leave to appeal in the Court of Appeals, which was denied for lack of merit, and he then filed an application for leave to appeal in this Court, requesting that *Bender* be reconsidered. We granted this application, *People v Tanner*, 493 Mich 958 (2013), and heard oral argument on this case on November 6, 2013.

## II. STANDARD OF REVIEW

This court "review[s] a trial court's factual findings in a ruling on a motion to suppress for clear error. To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *People v Attebury*, 463 Mich 662, 668; 624 NW2d 912 (2001).

4

## III. BACKGROUND

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." US Const, Am V. See also Const 1963, art 1, § 17 (containing an identical Self-Incrimination Clause). This federal constitutional guarantee was made applicable to the states through the Fourteenth Amendment. *Malloy v Hogan*, 378 US 1, 3; 84 S Ct 1489; 12 L Ed 2d 653 (1964). Prior to 1966, a suspect's confession was constitutionally admissible if a court determined that it was made "voluntarily."[2] Despite the apparent textual emphasis on the voluntariness of a suspect's confession ("no person shall be compelled"), the United States Supreme Court held in *Miranda v Arizona*, 384 US 436, 444-445, 477-479; 86 S Ct 1602; 16 L Ed 2d 694 (1966), that the accused must be given a series of warnings before being subjected to "custodial interrogation" in order to protect his constitutional privilege against self-incrimination.[3] The right to have counsel present during custodial interrogation is, in the words of the United States Supreme Court, a corollary of the right against compelled self-incrimination, because the presence of counsel at this stage affords a way to "insure that statements made in the government-

---

[2] See *Brown v Mississippi*, 297 US 278; 56 S Ct 461; 80 L Ed 682 (1936) (a confession is inadmissible if extorted by brutality and violence); *Chambers v Florida*, 309 US 227, 238-239; 60 S Ct 472; 84 L Ed 716 (1940) (the defendant's confession was inadmissible when made "under circumstances calculated to break the strongest of nerves and stoutest resistance"); *Ashcraft v Tennessee*, 322 US 143; 64 S Ct 921; 88 L Ed 1192 (1944) (the modern voluntariness test began to emerge in *Ashcraft*, in which the Court examined the totality of the circumstances to determine whether a confession was voluntary).

[3] "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id*. at 444.

established atmosphere are not the product of compulsion." *Id*. at 466. See also *id*. at 470. If a suspect is not afforded *Miranda* warnings before custodial interrogation, "no evidence obtained as a result of interrogation can be used against him." *Id*. at 479 (citations omitted).

Once a suspect invokes his right to remain silent or requests counsel, police questioning must cease unless the suspect affirmatively reinitiates contact.[4] *Id*. at 473-474. In *Edwards v Arizona*, 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981) (citations omitted), the United States Supreme Court created "additional safeguards" for when the accused invokes his right to have counsel present during custodial interrogation:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . .

---

[4] Some have referred to *Miranda* as establishing what is essentially the equivalent of a "right not to be questioned":

> A final innovation of the *Miranda* decision was the creation of a right on the part of arrested persons to prevent questioning. The Court stated: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease . . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."

> The right not to be questioned was an addition to the traditional right to refrain from answering questions on grounds of potential self-incrimination. At the time of the Constitution, suspects had no right to cut off custodial interrogation, and no right of this sort was recognized in the Supreme Court's decisions prior to *Miranda* . . . . [United States Department of Justice, Office of Legal Policy, *The Law of Pretrial Interrogation*, 22 U Mich J L Reform 393, 484 (1989), quoting *Miranda*, 384 US at 473-474.]

6

> [H]aving expressed his desire to deal with the police only through counsel, [an accused] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

However, when a suspect has been afforded *Miranda* warnings and affirmatively waives his *Miranda* rights, subsequent incriminating statements may be used against him. *Miranda*, 384 US at 444, 479. A suspect's waiver of his *Miranda* rights must be made "voluntarily, knowingly, and intelligently." *Id*. at 444. The United States Supreme Court has articulated a two-part inquiry to determine whether a waiver is valid:

> First, the relinquishment of the right must have been "voluntary," in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [*Moran v Burbine*, 475 US 412, 421; 106 S Ct 1135; 89 L Ed 2d 410 (1986), citing *Fare v Michael C*, 442 US 707; 99 S Ct 2560; 61 L Ed 2d 197 (1979).]

Under the Fifth Amendment construct set forth by the United States Supreme Court, the defendant in the instant case was afforded his *Miranda* rights by the police and invoked his right to counsel on October 17, 2011. Defendant then reinitiated contact with the police the next day when he indicated that he wanted to "get something off his chest" and speak with the officers. He was then afforded his *Miranda* rights a second time, and on this occasion waived those rights and chose not to reassert his right to counsel. During the following custodial interrogation by the police officers, defendant made an incriminating statement concerning his involvement in a murder. The only pertinent question then is whether defendant's lack of awareness of the appointed attorney's presence at the jail at the time of his *Miranda* waiver following his reinitiation of contact

7

with the police calls into question the validity of that waiver, including the waiver of his right to counsel-- rendering it something other than "voluntary, knowing, and intelligent"-- and thus requires suppression of any subsequent incriminating statements.

## A. *MORAN V BURBINE*

The United States Supreme Court has addressed this question for purposes of the federal criminal justice system in *Moran v Burbine*, 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986), in which it held that the failure of police to inform a suspect of the efforts of an attorney to reach that suspect does *not* deprive the suspect of his right to counsel or otherwise invalidate the waiver of his *Miranda* rights. In *Moran*, the defendant confessed to the murder of a young woman after he had been informed of, and waived, his *Miranda* rights. While the defendant was in custody, his sister retained an attorney to represent him. The attorney then contacted the police and was assured that all questioning would cease until the next day. However, less than an hour later, the police resumed interrogation of the defendant, and he confessed soon thereafter. At no point during the interrogation did the defendant request an attorney, and at no point did the police inform him that an attorney had contacted them. Before trial, the defendant moved to suppress his confession on the basis that "the police's failure to inform him of the attorney's telephone call deprived him of information essential to his ability to knowingly waive his Fifth Amendment rights." *Id*. at 421. However, the trial court denied the defendant's motion, concluding that he had received *Miranda* warnings, and had "knowingly, intelligently, and voluntarily waived his privilege against self-incrimination [and] his right to counsel." *Id*. at 418. The defendant was subsequently convicted of murder. The

Rhode Island Supreme Court affirmed his conviction, and the federal district court denied his habeas corpus petition. The federal appellate court, however, reversed the conviction. On further appeal, the United States Supreme Court reinstated the defendant's conviction, asserting as follows:

> Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. Under the analysis of the Court of Appeals, the same defendant, armed with the same information and confronted with precisely the same police conduct, would have knowingly waived his *Miranda* rights had a lawyer not telephoned the police station to inquire about his status. Nothing in any of our waiver decisions or in our understanding of the essential components of a valid waiver requires so incongruous a result. No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights. Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intentions to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law. [*Id*. at 422-423 (citations omitted).]

Any culpability on the part of the police inherent in their failing to inform the defendant of the attorney's availability had no bearing on the validity of his *Miranda* waiver:

> [W]hether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of [the defendant's] election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident. . . . Granting that the "deliberate or reckless" withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights

9

and the consequences of abandoning them. Because respondent's voluntary decision to speak was made with full awareness and comprehension of all the information *Miranda* requires the police to convey, the waivers were valid. [*Id*. at 423-424 (citations omitted).]

A rule requiring a suspect to be kept apprised of an attorney's presence in order for his *Miranda* waiver to be valid would unsettle *Miranda*'s balance between protection of a suspect's Fifth Amendment rights and the maintenance of effective and legitimate law enforcement practices:

> Because, as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process, a rule requiring the police to inform the suspect of an attorney's efforts to contact him contribute to the protection of the Fifth Amendment privilege only incidentally, if at all. This minimal benefit, however, would come at a substantial cost to society's legitimate and substantial interest in securing admissions of guilt. [*Id*. at 427.]

*Moran* concluded that "nothing disables the States from adopting different requirements of the conduct of its employees and officials as a matter of state law." *Id*. at 428.

## B. *PEOPLE v BENDER*

This Court reached a different conclusion from that of *Moran* in *Bender*, 452 Mich 594 (1996), holding that for a suspect's *Miranda* waiver to be made "knowingly and intelligently," police officers must promptly inform a suspect that an attorney is available when that attorney has made contact with them. In *Bender*, two defendants, Jamieson Bender and Scott Zeigler, were arrested for a series of thefts and taken into custody. An officer informed Bender's mother of his arrest. Subsequently, Bender's father called an attorney, who agreed to represent his son. When the attorney called the police and sought to speak with Bender, she was not permitted to do so. Defendant Ziegler's mother called

an attorney, who instructed her go to the police station and tell her son not to speak with anyone before speaking with the attorney. Police also did not allow Ziegler's mother to see her son and communicate the attorney's message. Without informing the defendants of their attorneys' efforts to contact them, police read the defendants their *Miranda* rights, defendants waived these rights, and each offered incriminating statements concerning their involvement in the thefts. At no point did the defendants request an attorney or assert their rights either to remain silent or to have counsel.

This Court adopted a per se rule that a suspect who has an attorney waiting in the wings does not make a "knowing and intelligent" waiver of his *Miranda* rights when the police have failed to inform him that an attorney has been made available to him and is at his disposal. *Id*. at 620 (opinion by CAVANAGH, J.). See also *id*. at 621 (opinion by BRICKLEY, C.J.). Although Justices LEVIN and MALLETT concurred with Justice CAVANAGH's lead opinion grounding the rule in Michigan's 1963 Constitution, the Court's holding was not ultimately grounded upon constitutional principles. Rather, Chief Justice BRICKLEY concurred with the result reached in the lead opinion, but declined to rely upon its interpretation of the Constitution, instead declaring that the requirement that an accused must be informed of an attorney's efforts to contact him constituted, as did *Miranda* itself at the time, a "prophylactic," or precautionary, rule. *Id*. at 620-621 (opinion by BRICKLEY, C.J.).[5] Justices CAVANAGH, LEVIN, and MALLETT

---

[5] In *Dickerson v United States*, 530 US 428, 438-440, 444; 120 S Ct 2326; 147 L Ed 2d 405 (2000), the United States Supreme Court determined that although *Miranda* is "prophylactic in nature," it is nonetheless a "constitutional rule that Congress may not supersede legislatively."

also joined Chief Justice BRICKLEY's concurrence, making it the operative opinion in the case.[6] Justice BOYLE, joined by Justices RILEY and WEAVER, dissented.

Although it did not provide the operative holding, the lead opinion grounded its reasoning upon independent state constitutional grounds, concluding, "we hold that, on the basis of Const 1963, art 1, § 17, neither defendant Bender nor defendant Zeigler made a knowing and intelligent waiver of his rights to remain silent and to counsel, because the police failed to so inform them [that attorneys had been retained and sought to contact them] before they confessed."[7] *Id*. at 614 (opinion by CAVANAGH, J.). Holding otherwise would "encourage the police to do everything possible, short of a due process violation, to prevent an attorney from contacting his client before or during interrogation." *Id*. at 615. To further sustain its conclusion, the lead opinion also noted that this Court has held that "the Michigan Constitution imposes a stricter requirement for a valid waiver of the rights to remain silent and to counsel than those imposed by the federal constitution." *Id*. at 611, citing *People v Wright*, 441 Mich 140, 147; 490 NW2d 351 (1992). The lead opinion declined to adopt a "totality-of-the-circumstances test," because the "inherently coercive nature of incommunicado interrogation requires a *per se*

---

[6] "The clear rule in Michigan is that a majority of the Court must agree on a ground for decision in order to make that binding precedent for future cases." *People v Anderson*, 389 Mich 155, 170; 205 NW2d 461 (1973), overruled on other grounds by *People v Hickman*, 470 Mich 602; 684 NW2d 267 (2004).

[7] The lead opinion acknowledged that "neither defendant's statement was involuntary." *Id*. at 604. Consequently, the only focus was upon whether the defendants' statements were made "knowingly and intelligently."

rule that can be implemented with ease and practicality to protect a suspect's rights to remain silent and to counsel." *Bender*, 452 Mich at 617 (opinion by CAVANAGH, J.).

In Chief Justice BRICKLEY's "majority opinion,"[8] he stated that

[t]his case rather clearly implicated both the right to counsel (Const 1963, art 1, § 20) and the right against self-incrimination (Const 1963, art 1, § 17). I conclude that rather than interpreting these provisions, it would be more appropriate to approach the law enforcement practices that are at the core of this case in the same manner as the United States Supreme Court approached the constitutional interpretation task in *Miranda v Arizona*; namely, by announcing a prophylactic rule.

The right to counsel and the right to be free of compulsory self-incrimination are part of the bedrock of constitutional civil liberties that have been zealously protected and in some cases expanded over the years. Given the focus and protection that these particular constitutional provisions have received, it is difficult to accept and constitutionally justify a rule of law that accepts that law enforcement investigators, as part of a custodial interrogation, can conceal from suspects that counsel has been made available to them and is at their disposal. If it is deemed to be important that the accused be informed that he is entitled to counsel, it is certainly important that he be informed that he has counsel. [*Id.* at 620-621 (opinion by BRICKLEY, C.J.) (citations omitted).]

Thus, the majority opinion, although referring to Michigan's Constitution for its "implications," declined nonetheless to interpret its provisions. Rather, it concluded that "we invite much mischief if we afford police officers 'engaged in the often competitive enterprise of ferreting out crime' the discretion to decide when a suspect can and cannot see an attorney who has been retained for a suspect's benefit." *Id.* at 622, quoting *Girodenello v United States*, 357 US 480, 486; 78 S Ct 1245; 2 L Ed 2d 1503 (1958). Instead, according to Chief Justice BRICKLEY, *Bender*'s rule would ensure that the

---

[8] Although Chief Justice BRICKLEY's opinion is labeled as a concurrence, it is practically speaking a majority opinion, and thus I will refer to it as such throughout this opinion.

criminal justice system remained accusatorial and not inquisitorial in nature, because the "good will of state agents is often insufficient to guarantee a suspect's constitutional rights." *Bender*, 452 Mich at 623 (opinion by BRICKLEY, C.J.).

Justice BOYLE, joined by Justices RILEY and WEAVER, dissented:

> [W]ithout a single foundation in the language, historical context, or the jurisprudence of this Court, a majority of the Court engrafts its own "enlightened" view of the Constitution of 1963, art 1, § 17, on the citizens of the State of Michigan. With nothing more substantial than a disagreement with the United States Supreme Court as the basis for its conclusion, a majority of the Court ignores our obligation to find a principled basis for the creation of new rights and imposes a benefit on suspects that will eliminate voluntary and knowledgeable confessions from the arsenal of society's weapons against crime. [*Id.* at 624 (BOYLE, J., dissenting).]

According to the dissent in *Bender*, the guarantee against compelled self-incrimination found in Article 1, § 17 of the Michigan Constitution provides no greater protection than the Fifth Amendment of the United States Constitution, and there is no justification for an interpretation of Michigan's Constitution that affords protections differently than the federal Constitution. *Id*. at 628-629. The *Bender* dissent concluded that

> [i]n its haste to create a novel "*Miranda*-like right[]," a majority of the Court blurs the distinction between the constitutional right to be free from compelled self-incrimination and the safeguards — *Miranda* warnings — created to protect that right. In effect, a majority of the Court creates prophylactic rules to protect prophylactic rights. The argument seems to be that it is necessary to inform a suspect that an attorney is attempting to contact him, which, in turn, effectuates the suspect's right to counsel, which, in turn, effectuates a suspect's right to remain silent, which, in turn, effectuates a suspect's right to be free from compelled self-incrimination. Safeguards for safeguards is absurd and is not required by the Michigan Constitution, the federal constitution, or *Miranda*.
>
> Given . . . that neither the Michigan nor the federal constitution require extension of the *Miranda* litany, the majority's only possible

14

justification for requiring the police to inform a suspect that an attorney wishes to speak with him must be grounded on policy concerns, not constitutional mandates. But policy concerns also fail under proper analysis. [*Id*. at 644.]

In sum, while *Bender* concluded that the failure of police officers to inform a suspect of an attorney's attempts to communicate with the suspect invalidates his *Miranda* waiver, there was no agreement as to whether Michigan's Constitution required that rule.

## IV.  ANALYSIS

The question presently before this Court is whether the rule of *Bender* should be maintained.[9]  The first and most consequential inquiry in resolving this question must, of course, pertain to whether *Bender* was correctly decided.  We conclude that it was not, concurring with the *Bender* dissent that the lead and majority opinions in that case

---

[9] In Justice MCCORMACK's dissent, she asserts that the instant case does not afford an appropriate vehicle to overrule *Bender* because, unlike defendants in *Bender*, defendant here repeatedly expressed his desire for counsel before ultimately making an incriminating statement to the police.  According to the dissent, the rule in *Bender* is "sufficient" to sustain the suppression of defendant's statement, but is not "necessary" in order to do so, because the voluntariness of defendant's statement was implicated, or called into question, by defendant's failed attempts to invoke his right to counsel.  However, in defendant's motion to suppress, he acknowledged that his statement to law enforcement was entirely voluntary, and argued only that his *Miranda* waiver had not been undertaken knowingly and intelligently pursuant to *Bender* and *Wright*, on the basis of the police's failure to inform him that an attorney had been appointed on his behalf and had sought to meet with him.  Thus, whether defendant's statement was undertaken voluntarily is not an issue that has been raised in this Court.  Furthermore, because defendant clearly and explicitly relied on *Bender* in his motion to suppress, and because the trial court also clearly and explicitly relied on *Bender* in granting this motion, the instant case does indeed afford an appropriate vehicle by which to assess the precedential value of *Bender*.  Whether defendant's statement should be suppressed on other constitutional grounds can be considered on remand, provided both that such constitutional arguments have not been precluded by defendant's pursuit of the current motion and that counsel offers the appropriate pretrial motions.

15

engaged in an unfounded creation of "constitutional rights," given that the lead opinion failed to undertake a constitutional analysis sufficient to ground rights in our "organic instrument of state government," *Sitz v Dep't of State Police*, 443 Mich 744, 760; 506 NW2d 209 (1993), and the majority opinion failed even to consider that same "organic instrument," instead relying on policy concerns and fears of law enforcement "mischief."

## A. THE *BENDER* RULE

The *Bender* majority cited no Michigan law to justify its creation of a state constitutional rule different from the United States Supreme Court's federal constitutional rule in *Moran*, ironically citing only several United States Supreme Court decisions at variance with *Moran*. Nonetheless, *Moran* rightly acknowledged, as it must, that its decision did not "disable[] the States from adopting different requirements for the conduct of its employees and officials as a matter of state law." *Moran*, 475 US at 428.[10] However, the *Bender* majority neither analyzed nor compared and contrasted to its federal counterpart the text of Article 1, § 17; cited no Michigan caselaw contrary to *Moran*; and most notably declined to ground its decision upon any interpretation of state constitutional provisions. At the same time nonetheless, the majority clearly sought to

---

[10] "Under the Supremacy Clause, the courts of this state are obliged to enforce the rights conferred by the United States Supreme Court even if the state constitution does not provide such rights." *Sitz*, 443 Mich at 759 (citation omitted). However, an "organic instrument of state government" need not be "interpreted as conferring the identical right." *Id.* at 760. "It is only where the organic instrument of government purports to *deprive* a citizen of a right granted by the federal constitution that the instrument can be said to violate the constitution." *Id.* at 760-761 (emphasis added). Accordingly, this Court may interpret our Constitution in a manner that confers *greater* protections on a suspect than those mandated by federal law.

16

characterize its rule as being one of constitutional provenance.[11]  Indeed, two years after

*Bender*, in *People v Sexton*, 458 Mich 43, 70-72; 580 NW2d 404 (1998), then Justice

BRICKLEY explained in his dissenting statement that

> [w]hile the *Bender* rule is prophylactic in nature like *Miranda*, that fact
> does not detract from its constitutional underpinnings.  Its very purpose is
> to protect a suspect's right to counsel and the privilege against self-
> incrimination.  To deny the constitutional import of this rule is to ignore the
> plain language set forth in *Bender*.  [Citation omitted.]

Thus, the majority purported to articulate a state constitutional rule in *Bender*,

prophylactic or otherwise, distinct from the federal constitutional rule in *Moran*,[12] while

apparently disclaiming all reliance on state constitutional provisions.

## B.  THE MICHIGAN CONSTITUTION

To determine whether Michigan's Constitution supports *Bender*, we must construe

our Constitution.  It is "a fundamental principle of constitutional construction that we

determine the intent of the framers of the Constitution and of the people adopting it,"

---

[11] For example, the majority acknowledged that "[t]his case rather clearly implicates both the right to counsel and the right against [compulsory] self-incrimination" before concluding that a prophylactic rule was appropriate.  *Bender*, 452 Mich at 620-621 (opinion by BRICKLEY, C.J.) (citations omitted).  The majority continued that "the right to counsel and the right to be free of compulsory self-incrimination are part of the bedrock of constitutional civil liberties that have been zealously protected and in some cases expanded over the years," and that "[g]iven the focus and protection that these particular constitutional provisions have received, it is difficult to accept and constitutionally justify a rule of law that accepts that law enforcement investigators, as part of a custodial interrogation, can conceal from suspects that counsel has been made available to them and is at their disposal."  *Id.* at 621.

[12] The *Bender* Court had the undeniable authority to articulate a state constitutional rule as long as the individual protections set forth in *Moran* were not contracted.

17

*Holland v Heavlin*, 299 Mich 465, 470; 300 NW 777 (1941), and we do this principally by examining its language. *Bond v Ann Arbor Sch Dist*, 383 Mich 693, 699-700; 178 NW2d 484 (1970). And we must do this even in the face of existing decisions of this Court pertaining to the same subject because there is no other judicial body, state or federal, that possesses the authority to correct misinterpretations of the Michigan Constitution.

"In interpreting our Constitution, we are not bound by the United States Supreme Court's interpretation of the United States Constitution, even where the language is identical." *People v Goldston*, 470 Mich 523, 534; 682 NW2d 479 (2004) (citation omitted). Rather, "[this Court] must determine what law 'the people have made.' " *Id.* (citation omitted). "[W]e may not disregard the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has withdrawn or not extended such protection" under the federal Constitution. *Sitz*, 443 Mich at 759. As explained in *Sitz*:

> [T]he courts of this state should reject unprincipled creation of state constitutional rights that exceed their federal counterparts. On the other hand, our courts are not obligated to accept what we deem to be a major contraction of citizen protections under our constitution simply because the United States Supreme Court has chosen to do so. We are obligated to interpret our own organic instrument of government. [*Id.* at 763.]

While members of this Court take an oath to uphold the United States Constitution, we also take an oath to uphold the Michigan Constitution,[13] which is the enduring expression

---

[13] Const 1963, art 11, § 1 states: "All officers, legislative, executive and judicial, before entering upon the duties of their respective offices, shall take and subscribe the following oath or affirmation: I do solemnly swear (or affirm) that I will support the Constitution of

of the will of "we, the people" of this state.[14]  In light of these separate oaths of office, we need not, and cannot, defer to the United States Supreme Court in giving meaning to the latter charter.[15]  Instead, it is this Court's obligation to independently examine our state's Constitution to ascertain the intentions of those in whose name our Constitution was "ordain[ed] and establish[ed]."[16]  Accordingly, we must examine the text and history of

the United States and the constitution of this state, and that I will faithfully discharge the duties of the office . . . according to the best of my ability."  See also US Const, art VI.

[14] Const 1963, art 1, § 1 states: "All political power is inherent in the people. Government is instituted for their equal benefit, security and protection."

[15] There is a reason why the United States and Michigan Constitutions should be read differently; namely, "we, the people" of the State of Michigan created Michigan's Constitution, and interpretations of this Constitution must reflect that will, and "we the people of the United States" created the United States Constitution, and interpretations of that Constitution must reflect that will.  These are distinct constitutions and distinct citizenries, and this Court must independently analyze our state Constitution to ensure that our citizens are receiving the measure of the protections that *they* created, which protections may or may not extend beyond those set forth by the federal Constitution.

[16] While there might well be an informal presumption that a United States Supreme Court interpretation of a federal constitutional provision constitutes the proper interpretation of a similar or identical state constitutional provision, this Court need not apply that presumption, and it need not defer to an interpretation of the United States Supreme Court, unless we are persuaded that such an interpretation is also most faithful to the state constitutional provision.  This Court has on occasion seemed to suggest that there is some specific burden on this Court to identify a "compelling reason" or justification for interpreting the words of the Michigan Constitution differently than the words of the United States Constitution.  See, e.g., *People v Nash*, 418 Mich 196, 214-215; 341 NW2d 439 (1983) ("We have, on occasion, construed the Michigan Constitution in a manner which results in greater rights than those given by the federal constitution, and where there is compelling reason, we will undoubtedly do so again.") (citations omitted); *People v Collins*, 438 Mich 8, 25; 475 NW2d 684 (1991) ("[A]rt 1, § 11 is to be construed to provide the same protection as that secured by the Fourth Amendment, absent 'compelling reason' to impose a different interpretation.") (citations omitted).  However, this cannot precisely describe this Court's relationship with the federal judiciary, even with the United States Supreme Court.  While it may almost always be prudent and

19

Article 1, § 17, as well as this Court's precedents pertaining to this provision, in order to ascertain both whether *Bender* was correctly decided and whether there is persuasive force in the United States Supreme Court's decision in *Moran*.[17]

## 1. CONSTITUTIONAL TEXT

"The primary objective in interpreting a constitutional provision is to determine the text's original meaning to the ratifiers, the people, at the time of ratification." *Wayne Co v Hathcock*, 471 Mich 445, 468; 684 NW2d 765 (2004). "The first rule a court should

---

responsible for this Court to examine federal precedents when they pertain to the same or similar language as in the Michigan Constitution, our responsibility in giving meaning to the Michigan Constitution must invariably focus upon *its* particular language and history, and the specific intentions of *its* ratifiers, and not those of the federal Constitution. Simply put, our exercise of judgment concerning the reasonable meaning of the provisions of our state Constitution cannot, consistently with our oath of office and our structure of constitutional federalism, be delegated to another judicial body.

[17] This Court has referred to various factors that may be relevant in determining whether Michigan's Constitution supports an interpretation that differs from that of the United States Constitution:

> 1) the textual language of the state constitution, 2) significant textual differences between parallel provisions of the two constitutions, 3) state constitutional and common-law history, 4) state law preexisting adoption of the relevant constitutional provision, 5) structural differences between the state and federal constitutions, and 6) matters of peculiar state or local interest. [*Collins*, 438 Mich at 31 n 39, citing *People v Catania*, 427 Mich 447, 466 n 12; 398 NW2d 343 (1986).]

We continue to believe that the application of these factors will often prove helpful to this Court in the interpretation of particular state constitutional provisions. However, we also believe that examination of these factors collectively supports the conclusion that the ultimate task facing this Court in cases requiring interpretation of particular Michigan constitutional provisions is to respectfully consider federal interpretations of identical or similar federal constitutional provisions, but then to undertake by traditional interpretive methods to independently ascertain the meaning of the Michigan Constitution.

follow in ascertaining the meaning of words in a constitution is to give effect to the plain meaning of such words as understood by the people who adopted it." *Bond*, 383 Mich at 699. "In applying this principle of construction, the people are understood to have accepted the words employed in a constitutional provision in the sense most obvious to the common understanding and to have 'ratified the instrument in the belief that that was the sense designed to be conveyed.' " *People v Nutt*, 469 Mich 565, 573-574; 677 NW2d 1 (2004) (citation omitted).

The text of Article 1, § 17 of the Michigan Constitution does not, in our judgment, provide for the rights articulated in *Bender*, when it states in the same words as the Fifth Amendment to the United States Constitution that "no person shall be compelled in any criminal case to be a witness against himself."[18] Ascertaining the "plain meaning" of "compelled" is of critical importance to our textual analysis, as we must determine precisely what type of protection the ratifiers intended to confer. The 1828 edition of *Webster's American Dictionary of the English Language* defined "compel" as "[t]o drive or urge with force, or irresistibly"; "to constrain"; "to oblige"; or "to necessitate, either by physical or moral force." At the time that our 1963 Constitution was ratified, the term

---

[18] Michigan's Constitution of 1835 did not contain a self-incrimination provision; however, the current provision was incorporated shortly thereafter in 1850. Const 1850, art 6, § 32. This provision remained unchanged in Article 2, § 16 of Michigan's Constitution of 1908 and in Article 1, § 17 of Michigan's Constitution of 1963. In 1963, Article 1, § 17 was amended to add "the right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed," but the self-incrimination part of the provision remained unchanged. Thus, the language of the Michigan Constitution's self-incrimination provision has remained consistent since its incorporation in 1850.

21

"compel" was commonly defined as "to force by physical necessity or evidential fact"; "to urge irresistibly by moral or social pressure"; "to domineer over so as to force compliance or submission"; or "to obtain by force, violence, or coercion." *Webster's Third New International Dictionary* (1961). Thus, at the time of the ratification of Article 1, § 17, the word "compel" referred to the use of coercion, violence, force, or pressure, all of which are relevant factors in assessing the genuine voluntariness of a confession.

The remainder of the terms contained in Article 1, § 17 require no individual examination, as their plain meanings appear "obvious to the common understanding." Accordingly, applying the definition of "compel" to the remainder of the language of Article 1, § 17, we find that the compelled self-incrimination provision in its entirety can be understood to provide that "no person shall be [coerced, forced, or pressured] in any criminal case to be a witness against himself." Given the provision's focus on a coercive custodial environment, Article 1, § 17 can be reasonably understood to protect a suspect from the use of his *involuntary* incriminating statements as evidence against him in a criminal case. Consequently, the text of Article 1, § 17 does not support *Bender*, which pertains not to the voluntariness of the confession itself, but to whether a suspect's *Miranda* waiver has been made "knowingly." That is, there was no dispute in *Bender* as to the voluntariness of the defendant's confession, only as to whether his *Miranda* waiver could be made "knowingly" absent awareness of an attorney's efforts to contact him; the

coercion or pressure contemplated by the text of Article 1, § 17, which relates to the *voluntariness* of a confession, was not implicated.[19]

## 2. CONSTITUTIONAL CONVENTION

When interpreting a constitutional provision, "[r]egard must also be given to the circumstances leading to the adoption of the provision and the purpose sought to be accomplished." *People v Nash*, 418 Mich 196, 209; 341 NW2d 439 (1983) (citation omitted). In determining the meaning of particular constitutional provisions to the ratifiers of the Constitution, this Court has noted that "constitutional convention debates and the address to the people, though not controlling, are relevant." *Id.* (citation omitted).[20] The primary focus should be on "any statements [the delegates] may have

---

[19] We need not decide whether our interpretation of "compel" for purposes of Article 1, § 17 is fully in accord with *Miranda*'s interpretation of the same term for purposes of the Fifth Amendment, given that *Miranda* has established an irreducible minimum standard for purposes of all custodial interrogations in Michigan, as well as those in every other state. Further, such a comparison would be irrelevant to our assessment of *Bender*, as *Bender*'s interpretation of "compel" goes beyond its meaning as contemplated by either Article 1, § 17 or *Miranda*. Pursuant to *Bender*, a suspect's voluntary *Miranda* waiver, made with full knowledge of his *Miranda* rights, can nonetheless be considered "compelled" for purposes of Article 1, § 17, and therefore invalid, solely because that suspect was not informed of an attorney's efforts to contact the suspect. Accordingly, *Bender* renders incriminating statements or confessions inadmissible by finding "compulsion" when there existed no form of the coercion, violence, force, or pressure contemplated by either the text of Article 1, § 17, or by the United States Supreme Court in its analysis of what it viewed as more subtle and nuanced forms of coercion in *Miranda*.

[20] Indeed, constitutional conventions, as a distinctive form of "super legislative history," deriving from the source of authority of the constitution itself, "we, the people," may be highly valuable in interpreting constitutional provisions:

> "[T]he constitutional convention is a distinctively American contribution to political theory and action . . . . [I]t is the personification of

23

made that would have shed light on why they chose to employ the particular terms they used in drafting the provision to aid in discerning what the common understanding of those terms would have been when the provision was ratified by the people." *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 656-657; 698 NW2d 350 (2005) (citation omitted).[21]

However, the records pertaining to Article 1, § 17 provide few such clues. There appears to have been no debate on the provision when it was first incorporated. When the Constitution was ratified in 1908, the Self-Incrimination Clause remained unchanged from the 1850 version, and the accompanying Address to the People in 1908 stated simply, "[n]o change from Sec. 32, Art. VI of the present constitution." Journal of the Constitutional Convention 1907-1908, p 1542. Although Article 1, § 17 was ratified in 1963, the only change was the addition of language that had no bearing on the Self-Incrimination Clause, and it was only the new language that was the subject of any convention debate or explication. 1 Official Record, Constitutional Convention 1961,

the sovereign people assembled for the discharge of the solemn duty of framing their fundamental law." [Schlam, *State Constitutional Amending, Independent Interpretation, & Political Culture*, 43 DePaul L Rev 269, 320 n 148 (1994), quoting Walker, *Myth & Reality in State Constitutional Development*, in Major Problems in State Constitutional Revision (Graves, ed, 1960), p 15 (alterations in original).]

[21] For example, in *People v Nash*, this Court concluded that it should interpret Michigan's Constitution differently than the United States Supreme Court's interpretation of the Fourth Amendment, in part because the records of the Michigan Constitutional Convention of 1961 indicated that the addition of an anti-exclusionary-rule provision was made in a particularly aggressive attempt by the delegates to assert state sovereignty in reaction to the United States Supreme Court decision in *Mapp v Ohio*, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961). *Nash*, 418 Mich at 211-213.

24

pp 545-553; 2 Official Record, Constitutional Convention 1961, p 3364. We find nothing in the records of the constitutional conventions to suggest that Article 1, § 17 means anything different from what its text most reasonably expresses.

### 3. CONSTITUTIONAL CASELAW

Although the text of Article 1, § 17 has mirrored its federal counterpart since its incorporation, the conclusion does not follow that this Court has interpreted the provision identically to the United States Supreme Court's interpretation of the Fifth Amendment. Consequently, it is necessary to examine this Court's precedent to determine whether caselaw in any way supports or contradicts *Bender*.

Before *Bender*, this Court had previously addressed the effect of an attorney's attempts to contact a suspect on the admissibility of the suspect's confession in *People v Cavanaugh*, 246 Mich 680; 225 NW 501 (1929), and *People v Wright*, 441 Mich 140; 490 NW2d 351 (1992), the latter cited in *Bender* and both cited by defendant in this case. However, neither opinion provides the foundation for *Bender's* proposition that Michigan courts have historically interpreted Michigan's compulsory self-incrimination provision to provide criminal suspects with greater protections than those afforded by the Fifth Amendment.

In *Cavanaugh*, the juvenile defendant was sentenced to prison for life for committing a rape in light of evidence that the victim identified his voice and given his alleged confession of guilt. The defendant testified at trial that the police had questioned him at night, that he had not been permitted to sleep, and that he asked for and was denied an attorney. An attorney who had been retained by the defendant's father came to

the police station, but was refused access to the defendant until the attorney proceeded to the courthouse to obtain a writ of habeas corpus. It is unclear if the defendant was aware of the attorney's presence, but in any event, he admitted to committing the crime. At trial, the defendant repudiated this confession, claiming it had been extorted by duress, brow-beating, intimidation, and by holding him incommunicado. The lower court sustained the prosecutor's objection to the defendant's proposed testimony regarding the circumstances surrounding his confession and did not permit the defendant to introduce evidence pertaining to his claim that police officers had held him incommunicado.

On appeal, this Court reversed the defendant's conviction and remanded for a new trial, concluding that the "[d]efendant had an undoubted right to lay before the jury his full claim of what the police said to him, and it was for the jury to say whether, under all the circumstances, the confession was voluntary." *Cavanaugh*, 246 Mich at 686. This Court continued:

> [A] confession, extorted by mental disquietude, induced by unlawfully holding an accused incommunicable, is condemned by every principle of fairness, has all the evils of the old-time *letter de cachet*, is forbidden by the constitutional guaranty of due process of law, and inhibited by the right of an accused to have the assistance of counsel . . . . Holding an accused incommunicable to parents and counsel is a *subtle and insidious method of intimidating and cowing*, tends to render a prisoner plastic to police assertiveness and demands, and is a trial of mental endurance under unlawful pressure.

> * * *

> The defendant was held incommunicable. He could not send for or employ counsel. His father was refused right to see him. When an attorney, presumably employed by his father, appeared at the jail and asked to see defendant, he was refused the right to do so until the attorney started for the courthouse to get a writ of *habeas corpus*. In this State a parent may not be denied the right to see and have conversation with a child in jail and

26

accused of crime. Neither may police, having custody of one accused of crime, deny an attorney, employed by or in behalf of a prisoner, the right to see and advise the accused. [*Id*. at 686, 688 (emphasis added).]

This Court concluded that "[w]hether defendant's call for father, mother, attorney, and priest did not make any difference upon the question of his alleged confession being voluntary was for the jury." *Id*. at 688-689. Consequently, defendant was entitled to a new trial, "at which the most searching examination of all the circumstances surrounding his alleged confession will be permitted." *Id*. at 689.

Although *Cavanaugh*, like *Bender*, addressed the admissibility of a confession in a circumstance in which an attorney had been denied access to a person facing custodial interrogation, *Cavanaugh* is distinguishable from *Bender* in at least three significant ways, and cannot provide its foundation. First, whereas *Bender* pertained to whether the defendants' *waivers* of their *Miranda* rights were made "knowingly," *Cavanaugh* pertained only to whether the defendant's *confession* was made voluntarily, as *Miranda* had not yet introduced into the Fifth Amendment analysis the rule that a defendant cannot be subject to custodial interrogation absent a "voluntary, knowing, and intelligent" waiver of *Miranda* rights.[22] Because there was no dispute in *Bender* regarding the voluntary nature of defendants' incriminating statements, *Cavanaugh*'s analysis concerning voluntariness cannot provide support for *Bender*. Second, *Cavanaugh* appropriately considered multiple factors-- only one of which was the police officer's

---

[22] There are two distinct "voluntariness" inquiries that must be considered in analyzing the admissibility of an incriminating statement or confession. First, the incriminating statement or confession itself must have been made voluntarily. Second, a suspect's *Miranda* waiver must have been made voluntarily. These distinct concepts of "voluntariness" must be borne in mind in assessing both *Bender* and *Moran*.

refusal to allow an attorney access to the defendant-- in its "totality of the circumstances"

analysis to assess whether the defendant's confession was made voluntarily, an analysis

which at that time was the accepted mechanism for determining compliance with

constitutional standards. However, *Bender*'s rule, invalidating all "unknowing" *Miranda*

waivers, is a per se rule that pertains to just a single factor. *Cavanaugh* cannot possibly

support this per se rule, given that *Cavanaugh* provided no indication that this Court had

ever determined that just one of its several factors-- the police officer's refusal to allow

the attorney to see the defendant-- gave rise to an independent and per se constitutional

right.[23] Third, in *Cavanaugh*, the juvenile defendant requested and was refused an

attorney. This Court properly considered the defendant's rejected request for an attorney

as one factor in its voluntariness analysis. In contrast, in *Bender*, the defendants never

requested an attorney before waiving their *Miranda* rights and providing incriminating

---

[23] Justice CAVANAGH's dissent misapprehends this point by stating "the majority argues that *Cavanaugh* cannot support *Bender* because *Cavanaugh* employed a 'totality of the circumstances' rule rather than the per se rule applied in *Bender*. The fact that *Cavanaugh* and *Bender* differed on what *test* should result from police interference with counsel's efforts to speak to a suspect does not lessen the fact that both *Cavanaugh* and *Bender* agreed that such police conduct is *unconstitutional* under the Michigan Constitution." *Post* at 12. However, our point is not that *Cavanaugh*'s application of a totality of the circumstances test instead of a per se rule is fatal to *Bender*, but is instead that by concluding that the police's refusal to allow the attorney to see the defendant was only one factor among many that might have rendered the defendant's confession involuntary, *Cavanaugh* nowhere concluded that such failure alone would render a confession inadmissible. In other words, because this Court concluded that the jury should hear a host of factors to determine whether the defendant's confession was voluntary, a single factor-- that counsel's requests to speak to the defendant were refused-- cannot be identified and cited for the proposition that *Cavanaugh* established as a matter of constitutional principle that a defendant must be informed of an attorney's attempts to contact him in order for his subsequent confession to be admissible.

statements.[24]  Accordingly, the defendants perceived no rejected request that could act to create a coercive atmosphere and potentially call into question the voluntariness of their statements.  Given these significant differences, *Cavanaugh* lends no support, we believe, to the notion that Michigan's Constitution supports the per se rule of *Bender*.[25]

In *Wright*, the defendant was arrested for murder, taken to the police station at around 5:00 a.m., and informed of his *Miranda* rights.  The defendant ultimately offered an incriminating statement to police officers after being deprived of food, water, and a place to sleep for a total of eleven hours while awaiting questioning.  Before the defendant made his statement, his family retained an attorney who made at least two trips to the police station, requesting to speak with the defendant.  Police officers refused the attorney's request both times.  The defendant ultimately gave a statement to the police without being informed of the attorney's efforts to reach him.  Before trial, the defendant filed a motion to suppress his statement.  At the suppression hearing, the trial court denied the defendant's motion, concluding that the defendant had never expressly asked for an attorney.  The trial court relied on *Moran*, reasoning that "although the police conduct was reprehensible, the law did not require the suppression of defendant's

---

[24] Similarly, in the case at hand, defendant failed to request an attorney after reinitiating contact with police and before waiving his *Miranda* rights and making an incriminating statement, despite the fact that defendant knew he could request an attorney, as he had done so the day before.

[25] It should be noted that, were the circumstances in *Cavanaugh* to arise today, the confession would be inadmissible, as the officers ignored the defendant's assertion of his right to counsel and continued to interrogate him, contrary to *Miranda*, 384 US at 473-474.

29

statements." *Wright*, 441 Mich at 145-146 (opinion by MALLETT, J.). The Court of Appeals affirmed, declining to impose more stringent standards on police conduct than the United States Supreme Court imposed in *Moran*. The defendant then appealed in this Court, and we granted leave to appeal to consider "whether a defendant has a right to know of his attorney's efforts to contact him" and "whether the failure by police to provide a defendant with proper food, water, or opportunity to sleep, renders a defendant's statements involuntary." *Id*. at 146.

In an opinion by Justice MALLETT, joined by Justice LEVIN, and separate opinions by Chief Justice CAVANAGH and Justice BRICKLEY, this Court suppressed the defendant's statements. The fragmented decision resulted in no binding precedent. In the lead opinion, Justice MALLET concluded that the confession had to be suppressed because a suspect must be informed of an attorney's in-person attempts to contact him, as Michigan's Constitution provides for such a right. *Id*. at 154-155. This opinion stated as follows:

> [U]nder our state's laws, we conclude that [defendant] did not make a knowing, voluntary, and intelligent waiver of his rights when the police, before he made a statement, refused to inform him that retained counsel tried or was currently trying to contact him. Without this knowledge, [the defendant] could not make a truly voluntary waiver of his essential rights. Given the opportunity to speak to a specific, retained and available attorney, [defendant's] decision may have been different.
>
> * * *
>
> Under Const 1963, art 1, § 17, a criminal suspect is given the right against self-incrimination, a right similar to that provided in the Fifth Amendment of the United States Constitution. This Court has held that the interpretation of our constitutional privilege against self-incrimination and that of the Fifth Amendment are the same. *In re Moser*, 138 Mich 302, 305; 101 NW 588 (1904). However, as the United States Supreme Court

concluded in *Moran*, states are free to adopt more protective standards under state law. Because we believe that it was necessary, in order to allow [defendant] to make a knowing and fully voluntary waiver of his Fifth Amendment rights, we extend the rights afforded under Const 1963, art 1, § 17, to include information of retained counsel's in-person efforts to contact a suspect. [*Id*. at 153-154 (citations omitted.]

In his separate concurrence, Chief Justice CAVANAGH agreed with Justice MALLETT's conclusion that the defendant's statement had to be suppressed and with Justice MALLETT's analysis in interpreting Michigan's constitutional privilege against self-incrimination "more broadly" than the Fifth Amendment. Chief Justice CAVANAGH wrote separately to emphasize that the "conclusion is even more clearly supported on the ground that the police conduct in this case violated defendant's right to counsel under Const 1963, art 1, § 20." *Id*. at 155-156 (CAVANAGH, C.J., concurring). In a separate concurring opinion, Justice BRICKLEY agreed that suppression of the defendant's statement was necessary, but based his decision on his conclusion that the defendant's *Miranda* waiver was made involuntarily, citing the "eleven-hour incommunicado interrogation during which [the defendant] was deprived of food, sleep, and contact with friendly outsiders, combined with the fact that he was not informed of available retained counsel." *Id*. at 172 (BRICKLEY, J., concurring). Justice RILEY dissented, joined by Justices BOYLE and GRIFFIN, concluding that defendant had knowingly waived his right to consult with an attorney before making his statement, and that the "objectionable" police conduct did not amount to a constitutional violation. *Id*. at 179-180 (RILEY, J., dissenting). The dissent noted that "[t]here is nothing conspicuous in the language of the Michigan Constitution that would distinguish it from the rights guaranteed by the federal constitution." *Id*. at 177.

*Wright* cannot provide the foundation for *Bender*, because it produced no consensus that Article 1, § 17 of Michigan's Constitution imposes greater requirements for a valid waiver of the rights to remain silent and to counsel than those imposed by the federal Constitution,[26] and its lead opinion, much like *Bender*'s majority opinion, suffered from scant analysis. The lack of analysis in both opinions is accounted for by the simple fact that there is no basis in the Michigan Constitution for the decisions reached in those opinions. That is, it is not the failure of analyses in these opinions that militates against their extension of *Miranda*; it is the absence of any language in the Michigan Constitution that would sustain such an analysis, and that is why each of these opinions is so barren of constitutional exegesis. Only Justice MALLETT's lead opinion in *Wright* explicitly "extend[ed] the rights afforded under Const 1963, art 1, § 17" to provide greater protection than those afforded by the Fifth Amendment. *Wright*, 441 Mich at 154 (opinion by MALLETT, J.). Justice LEVIN concurred, and Justice CAVANAGH agreed with Justice MALLETT's analysis, but no other member of this Court accepted the lead opinion's proposition, and Justice RILEY, joined by Justices BOYLE and GRIFFIN, explicitly rejected such a conclusion in her dissent. In any event, the lead opinion cannot provide a foundation for *Bender*, as it peremptorily concluded that the "accusatorial" nature of our criminal justice system warranted an "exten[sion of] the rights afforded

---

[26] Despite this, *Bender*'s lead opinion stated that "[i]n *Wright*, this Court held that the Michigan Constitution imposes a stricter requirement for a valid waiver of the rights to remain silent and to counsel than imposed by the federal constitution." *Bender*, 452 Mich at 611 (opinion by CAVANAGH, J.).

under Const 1963, art 1, § 17," without anywhere confronting the language of this provision or assessing in any way the intentions of the ratifiers.

Instead, in opining that Article 1, § 17 requires police to inform suspects of an attorney's efforts to contact a suspect in order that a *Miranda* waiver be valid, the lead opinion acknowledged that it "disagree[d]" with the Supreme Court's conclusion to the contrary in *Moran*, and noted that "states are free to afford their citizens greater protection than that granted by the federal government." *Wright*, 441 Mich at 148 (opinion by MALLETT, J.). Doubtless this is true, but such authority on our part does not relieve us from the obligation to ground our actions within our own Constitution. The lead opinion opined further, "[o]ther states have considered [*Moran*'s] question and have concluded that it is necessary for a suspect to be informed of an attorney's attempted contacts," and proceeded to summarize the decisions of the highest state courts of Connecticut, Delaware, and Oregon. *Id*. at 148-153. Such an observation, while also entirely appropriate as a prelude to extending *Miranda*, also does not relieve us of the obligation to "determine what law 'the people [of Michigan] have made.' " *Sitz*, 443 Mich at 759. This obligation is best accomplished by some effort to examine the language of our Constitution that purportedly supplies the basis for the newly discovered constitutional right, *Bond*, 383 Mich at 699-700, in this instance, Article 1, § 17. However, without engaging in any such analysis, the lead opinion turned to the facts of *Wright*, and offered the following:

> As Justice Stevens so eloquently stated, "[t]he recognition that ours is an accusatorial, and not an inquisitorial system nevertheless requires that the government's actions, even in responding to this brutal crime, respect those liberties and rights that distinguish this society from most others." *Moran*, [475 US] at 436 (Stevens, J., dissenting). Accordingly, under our

> state's laws, we conclude that Mr. Wright did not make a knowing, voluntary, and intelligent waiver of his rights when the police, before he made a statement, refused to inform him that retained counsel tried or was currently trying to contact him. Without this knowledge, Mr. Wright could not make a truly voluntary waiver of his essential rights. Given the opportunity to speak to a specific, retained and available attorney, Mr. Wright's decision may have been different. [*Wright*, 441 Mich at 153 (opinion by MALLETT, J.).]

The lead opinion concluded that while "this Court has held that the interpretation of our constitutional privilege against self-incrimination and that of the Fifth Amendment are the same," it was nevertheless appropriate to "extend the rights afforded by Const 1963, art 1, § 17, to include information of retained counsel's in-person efforts to contact a suspect." *Id*. at 154. The opinion was correct that this Court may interpret our constitution to afford greater protections than those afforded by the Fifth Amendment. However, the opinion did not perform the constitutional analysis necessary to "determine the intent of the framers and of the people adopting it," *Holland*, 299 Mich at 470. Consequently, *Wright*'s "exten[sion of] the rights afforded under Const 1963, art 1, § 17," cannot provide *Bender*'s foundation, because that extension was not supported by a majority of this Court, and it was not based on any semblance of the constitutional analysis necessary to ground new rights in the Michigan Constitution, an analysis that would seem to be of particular prudence in distinguishing an interpretation of a provision of the Michigan Constitution from a United States Supreme Court interpretation of the United States Constitution. Cf. *Nash*, 418 Mich at 209.

While this analysis indicates that there is no precedent specifically undergirding *Bender*,[27] it is also relevant to examine this Court's caselaw pertaining to Article 1, § 17, as well as to the admissibility of confessions in general, to inquire whether there is any other historical support from this Court for *Bender*. Specifically, we examine whether there is any precedent that foreshadowed *Bender* by suggesting either that (a) this Court has interpreted the self-incrimination provision of Article 1, § 17 to extend beyond the protections afforded by the Fifth Amendment; or (b) this Court has interpreted the self-incrimination provision of Article 1, § 17 as focused on something other than the voluntariness of a confession.

Concerning the first matter of exploration, there is no precedent that serves as a precursor to *Bender* by affording protections under Article 1, § 17 greater than those

---

[27] Justice CAVANAGH's dissent alleges that *Cavanaugh* provided specific support for *Bender*, as the justices in support of *Bender* "necessarily relied on *Cavanaugh* (as evidenced by the *Bender* opinion's citations to the *Wright* opinions, which cited *Cavanaugh*) as the primary source for the broader interpretation of the right against self-incrimination under the Michigan Constitution." *Post* at 19. However, *Bender* did not once cite *Cavanaugh*, and although several opinions in *Wright* did cite *Cavanaugh*, none cited it for the proposition that Michigan's right against compulsory self-incrimination affords greater protections than those afforded by the Fifth Amendment. In *Wright*, Justice MALLETT did not cite *Cavanaugh* in the lead opinion; Justice CAVANAGH cited *Cavanaugh* in his concurrence in support of his belief that the police conduct in *Wright* violated defendant's right to counsel under Article 1, § 20 and the *due process* provision now contained in Article 1, § 17, *Wright*, 441 Mich at 156-157 (opinion by CAVANAGH, J.); Justice BRICKLEY cited *Cavanaugh* in his concurrence for the proposition that incommunicado interrogation affects the *voluntariness* of a *Miranda* waiver, *id.* at 168-169 (opinion by BRICKLEY, J.); and Justice RILEY cited *Cavanaugh* in her dissent to rebut the argument that Michigan's Constitution requires officers to inform a defendant of an attorney's presence for that defendant's waiver to be made voluntarily and knowingly, *id.* at 178-180 (opinion by RILEY, J.). Thus, this Court did not rely on *Cavanaugh* for the proposition that the compulsory self-incrimination provision contained in Article 1, § 17 provides protections that extend beyond those afforded by the Fifth Amendment.

35

afforded under the Fifth Amendment. To the contrary, on at least two occasions, this Court had discussed the meaning of Michigan's Self-Incrimination Clause in comparison to the Fifth Amendment and indicated that Michigan's Self-Incrimination Clause is identical to its federal counterpart. In *In re Moser*, 138 Mich 302, 305; 101 NW 588 (1904), we noted that "[u]nder the Constitutions of Michigan and of the United States, no witness can be compelled to give testimony which might tend to criminate himself or expose him to a criminal prosecution. The provision in each Constitution is the same." Eighty years later, in *Paramount Pictures Corp v Miskinis*, 418 Mich 708, 726; 344 NW2d 788 (1984), we cited *Moser* and stated that "[h]aving examined prior decisions of this Court, we find nothing which requires an interpretation of our constitutional privilege against self-incrimination different from that of the United States Constitution." *Moser* and *Paramount* are instructive in that they provide insight concerning the legal environment at the time *Bender* was decided. Until that point, our interpretations of Article 1, § 17 provided no indication that this Court was prepared to extend the protections of Article 1, § 17 to exceed those of the Fifth Amendment.[28]

Concerning the second matter of exploration, while *Bender* implicates the "knowing" prong of a *Miranda* waiver, this Court's precedents indicate that Article 1,

---

[28] As we have indicated, we do not understand the assertions in *Moser* and *Paramount* as communicating that this Court, in carrying out its obligation to interpret Article 1, § 17, will forever adhere to all future interpretations of the Fifth Amendment by the United States Supreme Court, but merely that, in our judgment, the framers of these constitutional provisions possessed similar intentions with regard to their purposes, and possibly also that until that time, judicial understandings of Article 1, § 17 and the Fifth Amendment were in general accord.

§ 17 pertains solely to the *voluntariness* of a confession. "Under Michigan law, initially the admissibility of confessions was governed solely by common law, which adhered to the rule that involuntary confessions were inadmissible." *People v Conte*, 421 Mich 704, 721; 365 NW2d 648 (1984) (citations omitted). Subsequently, this Court recognized a constitutional basis for this rule, acknowledging that both the Due Process Clause, *Cavanaugh*, 246 Mich at 686, and the right against self-incrimination, *People v Louzon*, 338 Mich 146; 61 NW2d 52 (1953), provide alternate bases for holding involuntary confessions inadmissible. Before *Miranda*, few cases analyzed the admissibility of a confession in light of the Self-Incrimination Clause, but this Court did so in *People v Louzon*:

> We recognize the rule that confessions are inadmissible when secured by inflicting physical force or its equivalent by means of harsh or cruel treatment or false promises. The confession must be voluntary, but this does not mean that it must be volunteered. *No one may be forced to be a witness against himself.* [*Louzon*, 338 Mich 153-154 (emphasis added).]

Thus, this Court's use of the Self-Incrimination Clause to analyze the admissibility of a confession focused entirely on the voluntariness of the confession, referring to the type of force or coercion that is contemplated in part by the text of Article 1, § 17. Sometime after *Louzon*, *Miranda* transformed the inquiry pertaining to the admissibility of confessions, introducing the concept of a "voluntary, knowing, and intelligent" waiver of a suspect's *Miranda* rights. Before *Miranda* under Michigan law, voluntariness constituted the sole criteria for a confession to be admissible, under either the Due Process Clause, or Michigan's Self-Incrimination Clause, providing no support for

37

*Bender*'s proposition that Article 1, § 17 pertains in any way to whether a *Miranda* waiver is made "knowingly."

In his dissent, Justice CAVANAGH disagrees with this conclusion, and instead asserts that *Cavanaugh* foreshadowed *Miranda*'s "knowing and intelligent" requirement by holding that defendant's confession was obtained in violation of what is now Article 1, § 17, due to the "incommunicable" nature of the defendant's interrogation. According to the dissent, "incommunicado interrogation was at the center of the United States Supreme Court's explanation of the 'knowing and intelligent' requirement in *Miranda*," and "[b]ecause *Cavanaugh*'s explanation of the impropriety of the incommunicado interrogation methods used to extract the defendant's confession is strikingly similar to the impermissible interrogation methods that *Miranda* discussed, *Cavanaugh* is . . . more properly classified as consistent with *Miranda*'s 'knowing and intelligent' standard." *Post* at 8.

However, as previously noted, *Cavanaugh* explicitly pertained only to the voluntariness of a confession, and the "incommunicable" nature of defendant's interrogation was only one factor among many that persuaded this Court to remand for a determination whether defendant's confession was voluntary.[29] Although *Cavanaugh* in

---

[29] In his dissent, Justice CAVANAGH asserts that our "hyper-textualist" definition of "compulsion" is inconsistent with *Cavanaugh*'s understanding of the term, as *Cavanaugh* recognized that "incommunicable" interrogation may render a confession involuntary, and such "incommunicable" interrogation is not the type of "coercion, violence, force, or pressure" contemplated by our definition. However, *Cavanaugh* did not hold that a confession made in an "incommunicable" environment is involuntary, which is what the dissent would seem to suggest. *Cavanaugh* instead acknowledged only that the incommunicable nature of a confession might be *one* factor, combined with a host of others-- including sleep deprivation, duress, and "brow-beating," all factors that were

38

no way transformed this Court's traditional voluntariness analysis, even assuming arguendo that *Cavanaugh* recognized that more subtle forms of coercion might render a confession involuntary, there is simply no indication that *Cavanaugh* contemplated the "knowing and intelligent" requirement set forth almost four decades later in *Miranda*, as *Cavanaugh* nowhere hinted that a defendant must have some idea of his or her "rights" and the consequences of waiving those rights in order for his or her confession to be admissible. As *Miranda* had not yet introduced the concept of a waiver made "knowingly and intelligently," it is highly unlikely that *Cavanaugh* contemplated such a requirement, or that the ratifiers of the 1963 Constitution perceived *Cavanaugh* as setting forth such a requirement, particularly in view of the fact that *Cavanaugh* performed the traditional totality of the circumstances voluntary analysis that was routinely undertaken in determining the admissibility of a confession at that time.[30] As even Justice CAVANAGH's dissent acknowledges, "when interpreting the Michigan Constitution, we must recognize the law as it existed in Michigan *at the time* the relevant constitutional provision was adopted, and 'it must be presumed that a constitutional provision has been

---

traditionally considered in a voluntary analysis-- that might potentially render a confession involuntary. This Court should not isolate a single factor from *Cavanaugh* in order to establish the meaning of "compulsion" or "voluntariness" in Michigan, in disregard of what Article 1, § 17, and the body of caselaw both preceding and succeeding *Cavanaugh*, would otherwise suggest.

[30] Notably, even Justice BRICKLEY, writing for the majority in *People v Hill*, 429 Mich 382, 392-393; 415 NW2d 193 (1987), acknowledged that "[a]t the time of the drafting of our 1963 Constitution (pre-*Miranda*), the self-incrimination provision of the Fifth Amendment was only implicated when an extrajudicial statement was found to have been elicited involuntarily."

39

framed and adopted mindful of prior and existing law and with reference to them.' *People v Kirby*, 440 Mich 485, 492; 487 NW2d 404 (1992)." *Post* at 3 (emphasis added). The trajectory of our constitutional development under our equivalent of the Fifth Amendment, as well as this Court's consistent emphasis on the voluntariness of a confession, *including* in *Cavanaugh*, indicated no anticipation of *Miranda*, a notion as to which defense counsel himself agreed at oral argument.[31] Furthermore, *Cavanaugh* was decided under the Due Process Clause, and not the Self-Incrimination Clause, further suggesting that the ratifiers of the 1963 Constitution would not have perceived *Cavanaugh* as establishing that Michigan's provision against compulsory self-incrimination provided any greater protections than those afforded by the Fifth Amendment. Accordingly, neither *Cavanaugh*, nor any other precedent of this Court, supports the dissent's assertion that Article 1, § 17 was ratified in contemplation of the "knowing" requirement later set forth in *Miranda*.[32]

---

[31] At oral argument, defense counsel acknowledged that *Cavanaugh* established a right to counsel as a condition of *voluntariness*, and that the Court could not have been contemplating a "knowing and intelligent" standard at that time. Specifically, he stated, "I don't think really the courts had entertained as much beyond the voluntariness as came later on with *Miranda*—where it talks about voluntary, knowing, and intelligent. So as the law progressed, I think they weren't really addressing knowing and intelligent." Moreover, defendant has cited no caselaw apart from *Cavanaugh* that hints at either a "knowing" requirement, or a different "voluntariness" definition, than the one contemplated by Article 1, § 17.

[32] Going one step further, even assuming arguendo that *Cavanaugh* in some way did contemplate *Miranda*'s "knowing" prong, there is certainly no indication that *Cavanaugh* further contemplated the additional and specific protections placed on this prong by *Bender*.

40

Moreover, this Court's precedent provides no support for the proposition that this Court has placed extra emphasis on the "knowing" prong of a *Miranda* waiver in the period since *Miranda*. Before and after *Miranda*, "[w]here conditions did not overbear a defendant's will, statements have been held admissible." *Wright*, 441 Mich at 167, citing *People v Brannan*, 406 Mich 104; 276 NW2d 14 (1979); *People v Farmer*, 380 Mich 198; 156 NW2d 504 (1968); *People v Boyce*, 314 Mich 608; 23 NW2d 99 (1946). Even after *Miranda* and *Bender*, this Court has referred to *Moran* for the appropriate "knowing and intelligent" waiver standard, and stated that "[t]o knowingly waive *Miranda* rights, a suspect need not understand the ramifications and consequences of choosing to waive or exercise the rights that the police have properly explained to him" and "[l]ack of foresight is insufficient to render an otherwise proper waiver invalid." *People v Cheatham*, 453 Mich 1, 28-29; 551 NW2d 355 (1996) (citations omitted). Thus, *Bender*'s heightened requirement for a *Miranda* waiver to be made "knowingly" is inconsistent with this Court's previous treatment of the requirement.

This Court's precedents did not foreshadow, or otherwise provide support, for *Bender*. Nor do this Court's precedents support a finding that Article 1, § 17 requires a greater showing that a *Miranda* waiver was made "knowingly" than is required by the Fifth Amendment, given that this Court's interpretation of Article 1, § 17 has indicated that it pertains solely to the voluntariness of a confession itself, not to whether a confession is made with full knowledge of its consequences.[33]

---

[33] Justice CAVANAGH's dissent alleges that the right to counsel articulated in Article 1, § 20 of Michigan's Constitution, which states that, "[i]n every criminal prosecution, the accused shall have the right . . . to have the assistance of counsel for his or her defense,"

41

## 4. *BENDER* V *MORAN*

This Court's independent constitutional analysis of Article 1, § 17 leads us to the conclusion that *Moran*, not *Bender*, best analyzes the issue presented in this case. Our analysis indicates that Article 1, § 17 protects a suspect only from the use of confessions or incriminating statements obtained by coercion, violence, force, or pressure. However, *Bender*'s rule renders confessions and incriminating statements inadmissible that were in no way influenced by the type of coercive or compelling atmosphere contemplated by the provision.

*Miranda* was initially intended by the United States Supreme Court (at least until its later decision in *Dickerson*)[34] to serve as "one possible formula" by which to dispel the coercive atmosphere implicit in custodial interrogation; its purpose was to alleviate

_____

lends additional support for *Bender*. See *post* at 19-23. However, in *Kirby v Illinois*, 406 US 682, 688; 92 S Ct 1877; 32 L ED 2d 411 (1972), the United States Supreme Court held that the right to counsel attaches "only at or after the time that adversary judicial proceedings have been initiated against him." Although this Court initially recognized that there may be instances in which the right to counsel attaches prior to formal charging in *People v Anderson*, 389 Mich 155; 205 NW2d 461 (1973), and *People v Jackson*, 391 Mich 323, 338; 217 NW2d 22 (1974), we expressly overruled *Anderson* and its progeny, including *Jackson*, to the extent they "go[] beyond the constitutional text and extend[] the right to counsel to a time before the initiation of adversarial criminal proceedings" in *People v Hickman*, 470 Mich 602, 603-604, 608-609; 684 NW2d 267 (2004), and reaffirmed that the right to counsel attaches at or after the initiation of adversarial judicial criminal proceedings. In both *Bender*, and the instant case, defendants waived their *Miranda* rights and made incriminating statements before charges were issued, and therefore before the initiation of adversarial judicial criminal proceedings, signifying that the right to counsel had not yet attached. While the dissent articulates its own belief that *Anderson* and *Jackson* were overruled in error, and that *Kirby*'s restriction is "arbitrary," the majority of this Court did not agree and current law clearly indicates that the right to counsel had not yet attached at the time of defendant Bender and defendant Tanner's *Miranda* waivers. Therefore, Article 1, § 20 also does not support *Bender*.

[34] See note 5 of this opinion.

_____

42

what it viewed as the increasingly subtle and nuanced forms of coercion that sometimes typified the custodial interrogation process and undermined the genuine voluntariness of statements produced by this process. In fact, the United States Supreme Court has explained that "*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Colorado v Connelly*, 479 US 157, 170; 107 S Ct 515; 93 L Ed 2d 473 (1986). However, the situation in *Bender* falls considerably outside the scope of the custodial interrogation process that defined the constitutional rationale for *Miranda*. That is, *Bender*'s rule renders inadmissible even statements and confessions made following an indisputably voluntary and informed *Miranda* waiver absent even the slightest hint of the subtle or nuanced forms of coercion that served as the justification for *Miranda*. *Miranda*'s treatment of such forms of coercion at least sought to remain faithful to the Fifth Amendment's traditional voluntariness standard.[35]

---

[35] The United States Supreme Court has determined that, despite its initial "prophylactic" character, *Miranda* is now a "constitutional rule." *Dickerson*, 530 US at 438-440, 444. However, this does not necessarily mean that *Bender*'s "prophylactic" rule is also constitutional in character. Although *Miranda* affords protections that seem to exceed the textual boundaries of the Fifth Amendment, the United States Supreme Court has emphasized that the point of *Miranda* is to protect against the coercive nature of the custodial interrogation environment, which clearly does implicate the Fifth Amendment. However, because *Bender* is implicated even when a confession is altogether voluntary and non-coercive, and because *Bender* pertains to whether the *Miranda* waiver was knowing, and not to the voluntariness of the confession, it is hardly self-evident that *Bender* is "prophylactic" in the same way in upholding the Constitution as was *Miranda*. Because *Bender* invalidates confessions made absent any evidence of the type of coercive custodial interrogation environment that motivated *Miranda*, *Bender* does not further *Miranda*'s purpose of dissipating the impact of this environment, or at the very least does so in a far more indirect and attenuated manner by, in the words of the *Bender* dissent, "creat[ing] prophylactic rules to protect prophylactic rights." *Bender*, 452 Mich at 644. Contrary to Justice CAVANAGH's dissent, we do not conclude that it is *Bender*'s

43

Our independent examination of Article 1, § 17 supports *Moran*'s conclusion that "full comprehension of [the *Miranda* rights] are sufficient to dispel whatever coercion is inherent in the interrogation process," *Moran*, 464 US at 427, because the warnings provide a suspect with the necessary information both to apprehend these rights and to make an intelligent and knowing waiver of the rights if he chooses. The waiver of rights cannot logically be affected by events that are unknown and unperceived, such as the fact that an attorney is somewhere present to offer assistance. As explained by one scholar:

> If there is any police misconduct, the suspect is unaware of such events because it is directed toward the attorney. Facts and events unknown to the suspect cannot have a coercive effect on the suspect. Therefore, the attorney's efforts and/or presence is irrelevant to the suspect's ability to make a voluntary, knowing, and intelligent waiver of his *Miranda* rights. Moreover, as the suspect is still read his *Miranda* rights, such events do not operate to deprive the suspect of the knowledge of his rights.

> To argue or conclude that a defendant, who by the good fortune of a family member hiring an attorney, must be told of the attorney's attempts to make contact in order to make a knowing and intelligent waiver of *Miranda* rights is illogical and nonsensical. In fact, for the majority's reasoning to make sense, the majority would have to conclude that persons who are capable of retaining an attorney, or have family or friends who are capable of hiring a retained attorney, are not capable of making a knowing and intelligent waiver of *Miranda* rights even when the attorney is not present. As is evident by the admissibility of a suspect's *Miranda* waiver in the ordinary custodial interrogation situation, the majority would not so conclude. [Carroll, *A Look at People v Bender: What Happens when the Michigan Supreme Court Oversteps Its Power to Achieve A Results-Oriented Decision*, 74 U Det Mercy L Rev 211, 236-237 (1997) (citations omitted).]

---

"prophylactic" character that "deprives the [*Bender*] rule of constitutional status," *post* at 14, but rather the nature of the rule itself.

We therefore agree with *Moran* that an outside and unperceived development, such as an attorney's presence and initiation of contact with police, "can have no bearing on [a suspect's] capacity to comprehend and knowingly relinquish a constitutional right." *Moran*, 475 US at 422.[36]  Instead, as noted by the United States Supreme Court in *Colorado v Spring*, 479 US 564, 577; 107 S Ct 851; 93 L Ed 2d 954 (1987), "the additional information could affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature."  It might not be in a suspect's best interest to make a statement, but this Court need not concern itself with the wisdom of a suspect's confession.  To the contrary, voluntary but "foolish" confessions should be welcomed, as a suspect's perhaps unwise but purely voluntary urge to tell the truth is vital in assisting the fact-finder in ultimately ascertaining the truth of what occurred.[37]

---

[36] The fact that counsel in this case was appointed, whereas counsel in *Bender* was retained, makes no difference to our analysis, or to *Bender* itself as far as we can see.  In neither instance can an attorney's unsuccessful efforts to contact a defendant affect the defendant's ability to apprehend and voluntarily waive his *Miranda* rights.

[37] This case illustrates the problems with *Bender*.  Defense counsel concedes that defendant's waiver was made voluntarily, and there are no allegations that defendant did not understand the *Miranda* rights that he waived.  Because defendant did not invoke his right to counsel after reinitiating discussion with the police and being advised of his *Miranda* rights a second time, and because the adversarial proceedings had not yet begun, the prosecutor was not required to contact the court, and the court was not required to appoint an attorney for defendant.  Had the prosecutor and court not been proactive in effecting the appointment of an attorney, *Bender* never would have been implicated, because there would have been no attorney of whose presence defendant needed to be informed.  Instead, the prosecutor, on behalf of the people, was effectively sanctioned by the suppression of defendant's voluntary statements for having taken the precaution of seeking out counsel in the event that defendant requested counsel before or during his interrogation.  Consequently, *Bender* has the effect of discouraging the type of initiative shown by the prosecutor, because police officers and prosecutors will almost certainly be

45

In sum, independent examination of Article 1, § 17 persuades us that the United States Supreme Court correctly interpreted this issue in *Moran*. This examination further supports *Moran*'s conclusions that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right," that the " 'deliberate or reckless' withholding of information . . . is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them," and that the *Miranda* warnings alone "are sufficient to dispel whatever coercion is inherent in the interrogation process." *Moran*, 475 US at 422-424, 427. Because our constitutional analysis demonstrates that Article 1, § 17 does not confer the protections set forth in *Bender*, but instead supports *Moran*'s analysis and conclusion, we conclude that *Bender* was wrongly decided. We conclude, as did the United States Supreme Court in *Moran*, that the failure of police to inform a suspect of an attorney's efforts to contact him does not invalidate an otherwise "voluntary, knowing, and intelligent" *Miranda* waiver.

## C. STARE DECISIS

When this Court determines that a case has been wrongly decided, as we do here with regard to *Bender*, it must next determine whether it should overrule that precedent, a decision that should never be undertaken lightly. The application of stare decisis is "generally 'the preferred course, because it promotes the evenhanded, predictable, and

more reluctant to facilitate counsel before one is legally required if the consequence is the suppression of evidence.

consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.' " *Robinson v Detroit*, 462 Mich 439, 463; 613 NW2d 307 (2000), quoting *Hohn v United States*, 524 US 236, 251; 118 S Ct 1969; 141 L Ed 2d 242 (1998). However, "stare decisis is a 'principle of policy' rather than 'an inexorable command,' and . . . the Court is not constrained to follow precedent when governing decisions are unworkable or are badly reasoned." *Robinson*, 462 Mich at 464 (citations omitted). This Court has discussed the proper circumstances under which it will overrule prior case law:

> This Court has stated on many occasions that "[u]nder the doctrine of stare decisis, principles of law deliberately examined and decided by a court of competent jurisdiction should not be lightly departed." . . . [.] "Before this court overrules a decision deliberately made, it should be convinced not merely that the case was wrongly decided, but also that less injury will result from overruling than from following it." When it becomes apparent that the reasoning of an opinion is erroneous, and that less mischief will result from overruling the case rather than following it, it becomes the duty of the court to correct it. [*People v Graves*, 458 Mich 476, 480-481; 581 NW2d 229 (1998) (citations omitted) (alteration in original).]

When performing a stare decisis analysis, this Court should review *inter alia* "whether the decision at issue defies 'practical workability,' whether reliance interests would work an undue hardship, and whether changes in the law or facts no longer justify the questioned decision." *Robinson*, 462 Mich at 464 (citation omitted). As for the reliance interest, "the Court must ask whether the previous decision has become so embedded, so accepted, so fundamental to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations." *Id*. at 466.

When questions before this Court implicate the Constitution, this Court arguably has an even greater obligation to overrule erroneous precedent. "[A] judicial tribunal is most strongly justified in reversal of its precedent when adherence to such precedent would perpetuate a plainly incorrect interpretation of the language of a constitutional provision or statute." *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143, 181; 615 NW2d 702 (2000), citing *Robinson*, 462 Mich at 463-468. This is because "the policy of stare decisis 'is at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions.'" *Kyser v Kasson Twp*, 486 Mich 514, 534, n 15; 786 NW2d 543 (2010), quoting *Agostini v Felton*, 521 US 203, 235; 117 S Ct 1997; 138 L Ed 2d 391 (1997). Thus, it is "our duty to reexamine a precedent where its reasoning or understanding of the Constitution is fairly called into question." *Robinson*, 462 Mich at 464, quoting *Mitchell v W T Grant Co*, 416 US 600, 627-628; 94 S Ct 1895; 40 L Ed 2d 406 (1974) (Powell, J., concurring). Although *Bender* disclaimed reliance on Michigan's Constitution, it nonetheless vaguely referred to its provisions in enacting its "prophylactic" rule, suggesting that this Court has a duty to review this decision under less deferential standards of stare decisis in light of our role as the final judicial arbiter of this Constitution.[38]

---

[38] Justice CAVANAGH's dissent emphasizes that a stare decisis analysis should begin with the presumption that upholding precedent is the preferred course of action and that "when our caselaw concludes that the Michigan Constitution provides greater protection to our citizens than that provided by the federal Constitution, . . . 'this Court should be required to show a compelling reason to depart from [that] past precedent.'" *Post* at 24 (alteration in original) (citation omitted). We agree that precedent should not be lightly overruled, and that a presumption should generally obtain in favor of upholding precedent, although we do not understand why particular precedents that have interpreted our Constitution in

We conclude that overruling *Bender* would not produce "practical real-world dislocations," primarily because *Bender* obviously cannot be said to have caused suspects to "alter their conduct in any way." See *People v Petit*, 466 Mich 624, 635; 648 NW2d 193 (2002). As *Moran* noted, "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Moran*, 475 US at 422. It seems highly unlikely that a suspect being interrogated, after a day earlier having expressly refused to waive his right to counsel and then reconsidering that decision by affirmatively seeking to speak with police and then expressly waiving his right to counsel, would thereafter rely on *Bender* in determining that he need not ask for an attorney because the officers have a legal duty to inform him that an attorney has initiated contact with them. Although a suspect might later come to have second thoughts and prefer that he had not waived his right to counsel, "[s]uch after-the-fact awareness does not rise to the level of a reliance interest because to have reliance the knowledge must be of the sort that causes a person or entity to attempt to conform his conduct to a certain norm before the triggering event." *Robinson*, 462 Mich at 466-467. Consequently, *Bender* has not become so "fundamental to everyone's expectations" that to overrule it would result in "real-world dislocations." *Id*. at 466. Further, that *Bender* can fairly be considered to be "workable," in the sense that the police may clearly understand their legal obligations to a defendant and his

a manner different than similar language in the federal constitution should give rise to any special rule of stare decisis.

49

attorney, does not render "practically unworkable" a regime in which a defendant's rights are just as clearly understood.

Contrary to *Bender*, we do not believe that increased "mischief" will result from this Court's failure to maintain the rule expounded in that case as the constitutional law of this state. As already noted, we agree with *Moran* that the constitutional "voluntariness" of a confession or incriminating statement is not implicated by the failure of police to inform the defendant of the presence of an attorney before proceeding with a custodial interrogation after *Miranda* warnings have been given and *Miranda* rights waived. Whether a defendant does or does not possess knowledge of an attorney's outside presence cannot affect whether that defendant understands the rights that he or she is waiving, and neither the United States Supreme Court nor this Court has ever accepted the proposition that an attorney must be present in order that a *Miranda* waiver be characterized as "voluntary, knowing, and intelligent."

*Moran* accurately highlighted the competing policies informing both *Miranda* and its progeny, including *Moran* itself:

> Custodial interrogations implicate two competing concerns. On the one hand, "the need for police questioning as a tool for effective enforcement of criminal laws" cannot be doubted. Admissions of guilt are more than merely "desirable," they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law. On the other hand, the Court has recognized that the interrogation process is "inherently coercive" and that, as a consequence, there exists a substantial risk that the police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion. *Miranda* attempted to reconcile these opposing concerns by giving the defendant the power to exert some control over the course of the interrogation. . . . Police questioning, often an essential part of the investigatory process, could continue in its traditional form, the Court held, but only if the suspect clearly understood that, at any time, he could bring

50

the proceeding to a halt or, short of that, call in an attorney to give advice and monitor the conduct of his interrogators.

> The position urged by [defendant] would upset this carefully drawn approach in a manner that is both unnecessary for the protection of the Fifth Amendment privilege and injurious to legitimate law enforcement. Because, as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process, a rule requiring the police to inform the suspect of an attorney's efforts to contact him would contribute to the protection of the Fifth Amendment privilege only incidentally, if at all. This minimal benefit, however, would come at a substantial cost to society's legitimate and substantial interest in securing admissions of guilt. [*Moran*, 475 US at 426-427 (citations omitted).]

The *Moran* Court's concern that further protections against self-incrimination, such as those set forth in *Bender*, would impinge on the effectiveness of law enforcement are entirely valid, in our judgment. Neither the Fifth Amendment nor Article 1, § 17 is hostile to custodial interrogations-- only to those in which there is some coercive environment. Similarly, neither the Fifth Amendment nor Article 1, § 17 is hostile to confessions and self-incrimination-- only to those which are "compelled." Indeed, confessions and incriminating statements constitute perhaps the most compelling and important evidence available to fact-finders in the justice system's search for truth. Suppression of such evidence as the result of a *Bender* violation deprives these fact-finders of evidence allowing them to distinguish truth from falsity and innocence from guilt, while avoiding the conviction of innocent persons and the exoneration of guilty persons, all in pursuit of a principle that has never since the founding of our republic or state been viewed as a constitutional violation.[39]

---

[39] In his dissent, Justice CAVANAGH disagrees with the conclusion that *Bender* "impinge[s] on the effectiveness of law enforcement," instead noting that "it does not appear that Michigan's law enforcement has suffered from a serious inability to

Although overruling *Bender* will undeniably result in some unknown number of confessions and incriminating statements that might otherwise not have been provided, such evidence will have been voluntarily offered and have been preceded by "voluntary, knowing, and intelligent" waivers of *Miranda* rights. This evidence is to be welcomed, not repudiated, by any rational and effective criminal justice system. It is hard to comprehend a societal interest that is furthered by protecting persons who have engaged in serious criminal activities from the consequences of their own voluntary and intelligent decisions. While Justice CAVANAGH's dissent claims that "this statement entirely ignores the overriding principle of our criminal justice system: that a suspect is presumed innocent until proven guilty beyond a reasonable doubt," *post* at 27, we are inclined instead to concur with Justice BOYLE who observed in her *Bender* dissent that, "[i]f properly administered and validly waived, the *Miranda* warnings ensure protection of a defendant's right against compulsory self-incrimination, while at the same time allowing the police to fulfill their duty in a constitutionally permissible manner." *Bender*, 452 Mich at 626 (BOYLE, J., dissenting).

Because we believe that less, not more, "mischief" will likely result from overruling the case, we are further persuaded of the need to overrule *Bender*. See

---

effectively enforce the law in the 18 years since *Bender* was decided." *Post* at 28. However, as the prosecutor explained at oral argument, *Bender* violations frequently arise, and many of the negative effects of *Bender* are not obviously seen, but nonetheless exist, because "[b]y following *Bender*, confessions are never made so there's never the motion to suppress . . . or the case is never solved so charges are never filed . . . . [And] plea bargains are entered into that otherwise should not be, but have to be because of a *Bender* issue."

*Graves*, 458 Mich at 480-481, citing *McEvoy v Sault Ste Marie*, 136 Mich 172, 178; 98 NW 1006 (1904) (stating that in reversing precedent, the Court "should be convinced not merely that the case was wrongly decided, but also that less injury will result from overruling than from following it").

## V. CONCLUSION

An examination of Michigan's Constitution and a review of this Court's precedents compel the conclusion that *Bender* was wrongly decided and should now be overruled. In accordance with *Moran*, we hold that "[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Moran* 475 US at 422-423. Although this Court need not interpret a provision of our Constitution in the same manner as a similar or identical federal constitutional provision, we are persuaded in the present instance, on the basis of our examination of Article 1, § 17, that the United States Supreme Court's interpretation of the Self-Incrimination Clause of the Fifth Amendment in *Moran* constitutes the proper interpretation of Article I, § 17 as well. We reverse the trial court's suppression of incriminating statements made by defendant during custodial interrogation and remand to that court for further proceedings consistent with this opinion.

Stephen J. Markman
Robert P. Young, Jr.
Mary Beth Kelly
Brian K. Zahra
David F. Viviano

53

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

                                      No. 146211

GEORGE ROBERT TANNER,

      Defendant-Appellee.

_____

CAVANAGH, J. (*dissenting*).

In *People v Bender*, 452 Mich 594, 620; 551 NW2d 71 (1996) (opinion by CAVANAGH, J.); *id*. at 623 (opinion by BRICKLEY, C.J.), we held that police cannot conceal from suspects that counsel has been made available to them.[1] Although that decision has stood for nearly 20 years, today the majority casts *Bender* aside as "wrongly decided." Because I continue to believe that *Bender* correctly announced a rule firmly rooted in the Michigan Constitution, I dissent.

## I. INTRODUCTION

The majority explains its decision by first stating that, in *Moran v Burbine*, 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986), the United States Supreme Court reached the opposite conclusion. However, as the majority acknowledges, the divergent results in

---

[1] This Court also reached the same conclusion in an earlier plurality opinion. See *People v Wright*, 441 Mich 140; 490 NW2d 351 (1992).

*Moran* and *Bender* cannot support the majority's conclusion that *Bender* was wrongly decided. Indeed, according to the United States Supreme Court, "a State is free as a matter of its own law to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards." *Oregon v Hass*, 420 US 714, 719; 95 S Ct 1215; 43 L Ed 2d 570 (1975), citing *Cooper v California*, 386 US 58, 62; 87 S Ct 788; 17 L Ed 2d 730 (1967), and *Sibron v New York*, 392 US 40, 60-61; 88 S Ct 1889; 20 L Ed 2d 917 (1968). Moreover, *Moran* extended this broad premise to the exact issue at hand, stating, "[n]othing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law." *Moran*, 475 US at 428. Finally, we have consistently concluded that we are not bound in our understanding of the Michigan Constitution by any particular interpretation of the United States Constitution. See, e.g., *Harvey v Michigan*, 469 Mich 1, 6 n 3; 664 NW2d 767 (2003).

Given that we are clearly free to interpret our Constitution more broadly than the United States Supreme Court has interpreted the federal Constitution, and the United States Supreme Court has permitted the creation of rules like the one from *Bender*, one must ask what is so wrong about *Bender* that it must be abandoned after nearly two decades of problem-free application in our state? According to the majority, Michigan's Constitution does not support *Bender*'s rule. I disagree.

Although the language of Const 1963, art 1, § 17,[2] is nearly identical to the language in the Fifth Amendment of the United States Constitution,[3] that does not necessarily indicate that we must interpret our Constitution in a manner consistent with the United States Supreme Court's interpretation of the federal Constitution. Rather, when interpreting the Michigan Constitution, we must recognize the law as it existed in Michigan at the time the relevant constitutional provision was adopted, and "it must be presumed that a constitutional provision has been framed and adopted mindful of prior and existing law and with reference to them." *People v Kirby*, 440 Mich 485, 492; 487 NW2d 404 (1992). Accordingly, I will begin with a review of an opinion decided long before the ratifiers adopted the 1963 Constitution and cited for support in *People v Wright*, 441 Mich 140; 490 NW2d 351 (1992), and *Bender*: *People v Cavanaugh*, 246 Mich 680; 225 NW 501 (1929).

## II. *PEOPLE V CAVANAUGH*: THE ORIGIN OF *BENDER*'S FOUNDATION IN THE MICHIGAN CONSTITUTION

In support of its conclusion that *Bender* is not rooted in the Michigan Constitution, the majority toils away for page after page of analysis arguing that the Michigan Constitution only protects a suspect from involuntary confessions. Moreover, the majority limits the scope of "involuntary confessions" to only those confessions that satisfy the dictionary definition of "compelled."

---

[2] Const 1963, art 1, § 17 states, in relevant part, "[n]o person shall be compelled in any criminal case to be a witness against himself . . . ."

[3] US Const, Am V, states in part that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself . . . ."

3

The result is that in the majority's view, a confession is inadmissible under art 1, § 17 only if the confession is obtained through "the use of coercion, violence, force, or pressure . . . ." *Ante* at 22. In fact, the majority concludes that our caselaw "focused entirely on the voluntariness of the confession," which only excludes confessions " 'secured by *inflicting physical force* or its equivalent *by means of harsh or cruel treatment . . . .*' " *Ante* at 37, quoting *People v Louzon*, 338 Mich 146, 153-154; 61 NW2d 52 (1953) (emphasis added).[4]

The problem with the majority's view is twofold: first it is rooted in a hyper-textualist analysis of the word "compelled" in art 1, § 17, an approach rejected in this area of law by the United States Supreme Court in *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), and throughout *Miranda*'s progeny. See, e.g., *Edwards v Arizona*, 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981) (explaining the protections applicable when an accused invokes the right to have counsel present during custodial interrogation). Second, the majority singularly focuses on pre-*Miranda* caselaw. Not surprisingly, that pre-*Miranda* caselaw does not use the terminology adopted in *Miranda* to explain the "knowing and intelligent" requirements. Thus, by

---

[4] I recognize that the majority acknowledges that "*Miranda* has established an irreducible minimum standard for purposes of all custodial interrogations in Michigan," *ante* at 23 n 19, and thus agrees that a confession may also be inadmissible if a suspect's waiver of rights is not made voluntarily, knowingly, and intelligently. However, by arguing that only "involuntary confessions" are prohibited under the Michigan Constitution and that the other limitations are only the product of *Miranda*'s interpretation of the federal Constitution, the majority erroneously concludes that our state courts never adopted a broader interpretation of the Michigan Constitution pre-*Miranda*, as will be explained later in this opinion.

4

focusing exclusively on the fact that pre-*Miranda* caselaw used the "voluntary confession" terminology, the majority determines that the pre-*Miranda* caselaw only prohibited the use of confessions obtained by "inflicting physical force" or "cruel treatment." However, simply because Michigan's pre-*Miranda* caselaw did not use the terminology adopted in *Miranda* does not necessarily mean that our caselaw did not adopt an understanding of art 1, § 17 that is broader than the hyper-textualist meaning espoused by the majority. Rather, we must consider the actual interrogation circumstances in those pre-*Miranda* opinions to determine whether we have historically interpreted our state Constitution to provide broader protection against self-incrimination than is provided in the federal Constitution.

In 1929, long before adoption of the 1963 Michigan Constitution, we considered a case in which the police denied counsel's request to speak with his client, whom the police were interrogating. *Cavanaugh*, 246 Mich at 687. In *Cavanaugh*, we found the police conduct impermissible, stating:

> "[H]olding an accused incommunicable, is condemned by every principle
> of fairness, . . . is *forbidden by the constitutional guaranty of due process of
> law*, and inhibited by the right of an accused to have the assistance of
> counsel. . . . Holding an accused incommunicable to parents and counsel is
> a subtle and insidious method of intimidating and cowing . . . ." [*Id*. at 686
> (emphasis added).]

*Cavanaugh* also provided, "*In this State . . .* police [may not], having custody of one accused of crime, deny an attorney, employed by or in behalf of a prisoner, the right to see and advise the accused." *Id*. at 688 (emphasis added).

As I explained in *Wright*, "it is clear that *Cavanaugh*, in view of its reference to the law '[i]n this State,' . . . was not referring to any rights under the federal constitution; rather, it was referring to the rights existing *under our state constitution*." *Wright*, 441 Mich at 158 (opinion by CAVANAGH, C.J.) (emphasis added). Indeed, this Court later concluded that *Cavanaugh* relied on "the Michigan constitutional guarantee of due process," which was then contained in Const 1908, art 2, § 16, and is now found in the constitutional provision at issue—Const 1963, art 1, § 17. *People v Conte*, 421 Mich 704, 722; 365 NW2d 648 (1984).

After understanding that *Cavanaugh* interpreted the Michigan Constitution, the next question is whether *Cavanaugh* interpreted the state constitutional language more broadly than the language of its federal counterpart. As previously noted, *Cavanaugh* concluded that "holding an accused *incommunicable* . . . is forbidden by the constitutional guaranty of due process of law, and inhibited by the right of an accused to have the assistance of counsel." *Cavanaugh*, 246 Mich at 686 (emphasis added). Holding a suspect "incommunicable" is substantially different from "inflicting physical force" or "cruel treatment," which, according to the majority, is the only type of "compulsion" that the Michigan Constitution prohibited pre-*Miranda*. Nevertheless, *Cavanaugh* concluded that the defendant's confession was obtained in violation of what is now art 1, § 17 of the Michigan Constitution. Thus, the majority's claim—that we have not previously interpreted Michigan's Constitution to provide protection against self-incrimination except with respect to confessions obtained by " 'inflicting physical

6

force' " or " 'by means of harsh or cruel treatment,' " *ante* at 37 (citation omitted)—is inconsistent with *Cavanaugh*.

In order to sidestep this inconsistency, the majority argues that *Cavanaugh* is distinguishable from *Bender* because *Cavanaugh* concluded that the defendant's *confession* was not *voluntary*, whereas *Bender* concluded that the defendant's *waiver* of rights was not made *knowingly*. The majority is correct that *Cavanaugh* did not mention whether the defendant's waiver of rights was made "knowingly" under the Michigan Constitution and instead referred to the "voluntariness" of the confession. However, as previously discussed, that is not surprising, given that *Cavanaugh* was decided 37 years before *Miranda* established the "knowing and intelligent" terminology referred to in *Bender*. Yet, concluding that *Cavanaugh* did not create the foundation for *Bender* on these grounds is, in my opinion, an oversimplification of *Cavanaugh*.

In my view, *Cavanaugh* foreshadowed *Miranda*'s understanding of the nature of the right protected by the constitutional guarantee that a person will not be "compelled" to be a witness against himself. Because *Cavanaugh* referred to the "voluntariness" of the defendant's confession, the majority insists that *Cavanaugh* is nothing more than a typical "voluntariness" case. As a result, the majority assumes that *Cavanaugh* concluded that the confession was the product of impermissible "compulsion," which the majority defines as "the use of coercion, violence, force, or pressure . . . ." *Ante* at 22. However, by focusing on only the terms used in *Cavanaugh*, the majority overlooks the context in which the terms were used as well as the fact that *Cavanaugh* never mentioned the types of "compulsion" the majority discusses. In fact, a police officer whose

7

testimony described the interrogation in *Cavanaugh* stated that the defendant "was not threatened in any manner by the officers nor was he offered any hope of reward nor any promises held to him for the signing of the statement . . . ." *Cavanaugh*, 246 Mich at 686-687. Rather, *Cavanaugh* only referred to the impermissibility of "holding an accused *incommunicable*." *Id*. at 686 (emphasis added). See, also, *id*. at 688 (noting that "[t]he defendant was held *incommunicable*") (emphasis added).

Critically, incommunicado interrogation was at the center of the United States Supreme Court's explanation of the "knowing and intelligent" requirement in *Miranda*: "The current practice of *incommunicado interrogation* is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself." *Miranda*, 384 US at 457-458 (emphasis added). Moreover, *Miranda* expressly acknowledged that incommunicado interrogation is not like coercion, violence, force, or pressure that the majority in this case discusses. See *id*. at 457 ("To be sure, [incommunicado interrogation] is not physical intimidation . . . ."). Nevertheless, *Miranda* concluded that incommunicado interrogation "is equally destructive of human dignity," *id*., and, therefore, violates a suspect's privilege against self-incrimination.

Because *Cavanaugh*'s explanation of the impropriety of the incommunicado interrogation methods used to extract the defendant's confession is strikingly similar to the impermissible interrogation methods that *Miranda* discussed, *Cavanaugh* is, in my view, more properly classified as consistent with *Miranda*'s "knowing and intelligent" standard. Stated differently, although *Cavanaugh* did not use the yet-to-be-created *Miranda* terminology, *Cavanaugh* nevertheless is consistent with *Miranda*'s analysis and

8

conclusion concerning knowing and intelligent waivers because *Cavanaugh* did not address coercive police conduct that affected the voluntariness of a suspect's confession.[5] The majority rejects this view and instead concludes that *Cavanaugh* never "hinted that a defendant must have some idea of his or her 'rights' . . . ." *Ante* at 39. I disagree because, in my view, an obvious result of holding a suspect incommunicado is that the suspect will lack knowledge of his or her rights, a conclusion that is even truer when the suspect is unaware that counsel, who could educate the suspect on those rights, is actively seeking to communicate with the suspect. Thus, in my view, *Cavanaugh* evidences that this Court did not interpret the Michigan Constitution to prohibit *only* confessions obtained by "inflicting physical force" or "cruel treatment." When viewed in this light, *Cavanaugh* supports *Bender*'s conclusion that denying counsel's request to communicate with a suspect amounts to impermissible incommunicado interrogation in violation of Const 1963, art 1, § 17.[6]

---

[5] The fact that defense counsel did not adopt this view at oral argument is of no moment: "this Court is not bound by the [parties'] interpretation of the case and may consider and analyze the facts and issues independent of such concession." *Camaj v S S Kresge Co*, 426 Mich 281, 290 n 6; 393 NW2d 875 (1986), citing *Sibron v New York*, 392 US 40, 58-59; 88 S Ct 1889; 20 L Ed 2d 917 (1968).

[6] The majority cites *In re Moser*, 138 Mich 302; 101 NW 588 (1904), and *Paramount Pictures Corp v Miskinis*, 418 Mich 708; 344 NW2d 788 (1984), in support of its conclusion that the Michigan Constitution has not been interpreted to provide more protection regarding self-incrimination than the federal Constitution. However, *Moser* pre-dates *Cavanaugh*. Because *Cavanaugh* granted the protection under the *state* Constitution, and the framers of the 1963 Michigan Constitution are presumed to have been aware of *Cavanaugh*, I do not believe that *Moser* supports the majority's conclusion. Regarding *Paramount Pictures*, that opinion did not cite *Cavanaugh* and thus provides no insight regarding *Cavanaugh*'s impact on our pre-*Miranda*

9

The majority also attempts to distinguish *Cavanaugh* from *Bender* by arguing that *Miranda* protects only against police *coercion* and *Bender* therefore "falls considerably outside the scope of the custodial interrogation process which defined the constitutional rationale for *Miranda*." *Ante* at 43, citing *Colorado v Connelly*, 479 US 157, 170; 107 S Ct 515; 93 L Ed 2d 473 (1986). Accordingly, the majority appears to argue that there is no material difference between the pre-*Miranda* test to determine whether a suspect's confession was *voluntary* and the post-*Miranda* test to determine whether a suspect's waiver was "knowing and intelligent." However, that approach ignores that *Miranda* requires analysis of two distinct prongs—the voluntariness prong and the knowing and intelligent prong. Thus, the majority makes the

> fallacious assumption of a complete unity between the determinative factors of the pre-*Miranda* Fourteenth Amendment due process analysis (which was concerned solely with coercive police conduct that affected the voluntariness of a suspect's confession) and the post-*Miranda* waiver analysis (which requires analysis of two distinct prongs, only one of which—i.e., voluntariness—is logically, or in any other respect, related to coercive police practices). [*People v Cheatham*, 453 Mich 1, 52-53; 551 NW2d 355 (1996) (CAVANAGH, J., concurring in part).]

*Connelly* does not, however, support the majority's conclusion that *Miranda* protects only against police *coercion*. Rather, *Connelly* simply held that "coercive police activity is a necessary predicate to the finding that a confession is not '*voluntary*' within the meaning of the Due Process Clause of the Fourteenth Amendment," and determined that "[t]here is obviously no reason to require more in the way of a '*voluntariness*' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context."

---

interpretation of the Michigan Constitution.

10

*Connelly*, 479 US 167, at 169-170 (emphasis added). Thus, although it is unmistakable that coercive police conduct is as necessary to a finding of *involuntariness* under *Miranda* as it is under the substantive protection of the Fourteenth Amendment Due Process Clause, "[i]t is only with respect to the completely distinct 'knowing and intelligent' prong of a *Miranda* waiver analysis . . . that coercive police conduct is not required, either by logic or by law." *Cheatham*, 453 Mich at 54 (CAVANAGH, J., concurring in part).

That is not to say that courts should ignore police conduct when applying the knowing-and-intelligent prong of a *Miranda* analysis. Police conduct may still be relevant to the knowing-and-intelligent prong because "any police conduct that could have an effect on a suspect's requisite level of comprehension must be factored into the analysis[,]" which was clear before *Connelly*. *Id*. at 55. In fact, *Moran*, the very opinion the majority follows today, recognized that "the 'deliberate or reckless' withholding of information is objectionable as a matter of ethics," but concluded that "such conduct is only relevant to the *constitutional validity of a waiver if it deprives a defendant of knowledge* essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran*, 475 US at 423-424 (emphasis added). Accordingly, because *Miranda* protects suspects against more than just police coercion, *Bender* is not "outside the scope" of *Miranda*.

The majority also argues that *Cavanaugh* is irrelevant because, in *Cavanaugh*, the police denied the *suspect's* request for counsel, whereas *Bender* addressed denial of *counsel's* request to communicate with a suspect. However, *Cavanaugh* clearly encompassed police refusal to honor *counsel's* requests to speak to the suspect.

11

Specifically, *Cavanaugh* quoted police testimony establishing that the police denied a request by the suspect's father and a request by the suspect's counsel to speak to the suspect. *Cavanaugh*, 246 Mich at 686-687. Citing those facts, *Cavanaugh* condemned the police conduct, stating:

> In this State a parent may not be denied the right to see and have conversation with a child in jail and accused of crime. *Neither may police, having custody of one accused of crime, deny an attorney, employed by or in behalf of a prisoner, the right to see and advise the accused.* [*Id*. at 688 (emphasis added).]

Thus, *Cavanaugh* is applicable not only to situations in which the suspect's request for an attorney is denied, but to situations in which counsel's request to speak to a suspect is denied, as well.

Finally, the majority argues that *Cavanaugh* cannot support *Bender* because *Cavanaugh* employed a "totality of the circumstances" rule rather than the per se rule applied in *Bender*. The fact that *Cavanaugh* and *Bender* differed on what *test* should result from police interference with counsel's efforts to speak to a suspect does not lessen the fact that *Cavanaugh* and *Bender* agreed that such police conduct is *unconstitutional* under the Michigan Constitution. Indeed, the police also ignored the defendant's express request for counsel in *Cavanaugh*, but *Cavanaugh* nevertheless applied a totality of the circumstances rule. As the majority recognizes, were those circumstances to occur today, the subsequent confession would be per se inadmissible under *Miranda*, 384 US at 474. However, *Cavanaugh*'s conclusion that ignoring the defendant's request for counsel was unconstitutional is no less correct today simply because *Cavanaugh* applied a totality of

12

the circumstances rule rather than the *Miranda* per se rule. Similarly, *Cavanaugh*'s conclusion that ignoring counsel's request to communicate with the suspect was unconstitutional is no less correct today simply because *Cavanaugh* applied a totality of the circumstances rule rather than the *Bender* per se rule.

Moreover, as I explained in *Bender*, " 'a purported waiver [of *Miranda*] can never satisfy a totality of the circumstances analysis when police do not even inform a suspect that his attorney seeks to render legal advice.' " *Bender*, 452 Mich at 616 (opinion by CAVANAGH, J.), quoting *Bryan v State*, 571 A2d 170, 176 (Del, 1990) (emphasis omitted). " 'When the opportunity to consult counsel is in fact frustrated, there is no room for speculation what defendant might or might not have chosen to do after he had that opportunity.' " *Bender*, 452 Mich at 617 (opinion by CAVANAGH, J.), quoting *State v Haynes*, 288 Or 59, 75; 602 P2d 272 (1979). In fact, " 'police deception of a suspect through omission of information regarding attorney communications greatly exacerbates the inherent problems of incommunicado interrogation and requires a clear principle to safeguard the presumption against the waiver of constitutional rights.' " *Bender*, 452 Mich at 617 n 23 (opinion by CAVANAGH, J.), quoting *Moran*, 475 US at 452 (Stevens, J., dissenting). Accordingly, I continue to believe that the nature of "incommunicado interrogation requires a per se rule that can be implemented with ease and practicality to protect a suspect's rights to remain silent and to counsel." *Bender*, 452 Mich at 617 (opinion by CAVANAGH, J.).

Once it is understood that *Cavanaugh* prohibited police interference with counsel's efforts to communicate with a suspect based on the same state constitutional

13

language that was applied in *Bender*, the next question is whether *Bender* merely continued to apply *Cavanaugh*'s previously created rule or, as the majority argues, created a rule that did not exist before *Bender*. Therefore, I will review *Bender* and the plurality opinions from *Wright*, 441 Mich 140, *Bender*'s predecessor.

### III. *PEOPLE v WRIGHT* AND *PEOPLE v BENDER*

As the majority explains, *Bender* resulted in multiple opinions, and only Chief Justice BRICKLEY'S opinion garnered four votes. In addition, as the majority states, Chief Justice BRICKLEY'S opinion labeled the result of its holding a "prophylactic rule." *Bender*, 452 Mich at 621 (opinion by BRICKLEY, C.J.). However, I disagree with the majority that the arguably "prophylactic" character of the *Bender* rule deprives the rule of constitutional status. Rather, considering Chief Justice BRICKLEY'S opinion in its entirety, it is clear that he viewed *Bender*'s "prophylactic" rule in the same mold as *Miranda*'s "prophylactic" rule. See *id.* at 620-621 (expressing a preference to "approach the law enforcement practices that are at the core of this case in the same manner as the United States Supreme Court approached the constitutional interpretation task in [*Miranda*]; namely, by announcing a prophylactic rule"). And, notably, the United States Supreme Court has since explained that although *Miranda* is labeled a "prophylactic" rule, it is nevertheless a constitutional rule. See *Dickerson v United States*, 530 US 428, 438-440, 444; 120 S Ct 2326; 147 L Ed 2d 405 (2000).

Moreover, Chief Justice BRICKLEY'S *Bender* opinion indisputably recognized the constitutional underpinnings of its analysis. For example, Chief Justice BRICKLEY noted that the case "rather clearly implicates both the right to counsel (Const 1963, art 1, § 20)

14

and the right against self-incrimination (Const 1963, art 1, § 17)," which are "part of the bedrock of *constitutional* civil liberties . . . ." *Bender*, 452 Mich at 620, 621 (opinion by BRICKLEY, C.J.) (emphasis added). Additionally, Chief Justice BRICKLEY determined that "it is difficult to accept and *constitutionally justify* a rule of law that accepts that law enforcement investigators, as part of a custodial interrogation, can conceal from suspects that counsel has been made available to them and is at their disposal." *Id*. at 621 (emphasis added). Thus, Chief Justice BRICKLEY concluded that any other rule would be "insufficient to guarantee a suspect's *constitutional rights*." *Id*. at 623 (emphasis added).

We also have the benefit of then Justice BRICKLEY'S further explanation of his *Bender* opinion by way of his dissent in *People v Sexton*, 458 Mich 43; 580 NW2d 404 (1998). In *Sexton*, a majority of this Court concluded that *Bender* did not apply retroactively and implied that *Bender* lacks a constitutional basis, as the majority concludes today. However, Justice BRICKLEY explained that *Bender*'s "very purpose is to protect a suspect's right to counsel and the privilege against self-incrimination"; therefore, "[t]o deny the *constitutional* import of [*Bender*] is to ignore the plain language" of the *Bender* opinion. *Id*. at 70 (BRICKLEY, J., dissenting) (emphasis added). Accordingly, Justice BRICKLEY flatly concluded that "the majority's conclusion that *Bender* does not implicate a defendant's constitutional rights [is] wrong and without any viable legal support." *Id*. at 72.

Regardless of whether Chief Justice BRICKLEY'S *Bender* opinion definitively rooted its analysis in the Michigan Constitution, I nevertheless retain my belief that the *Bender* rule is a product of our Constitution, because art 1, § 17 "requires the police to

15

inform the suspect that a retained attorney is immediately available to consult with him, and failure to so inform him before he confesses per se precludes a knowing and intelligent waiver of his right to remain silent and to counsel." *Bender*, 452 Mich at 597 (opinion by CAVANAGH, J.).

As I did in *Bender*, I continue to recognize that "[u]nder federal law, a waiver is knowingly and intentionally made where no police coercion was involved and where the defendant understands that he has the right to remain silent and that the state intends to use what he says to secure a conviction." *Id*. at 612, citing *Moran*, 475 US at 422-423. However, it is also my opinion that "in Michigan, more is required before the trial court may find a knowing and intelligent waiver." *Bender*, 452 Mich at 612 (opinion by CAVANAGH, J.). Specifically, "in order for a defendant to fully comprehend the nature of the right being abandoned and the consequences of his decision to abandon it, he must first be informed that counsel, who could explain the consequences of a waiver decision, has been retained to represent him." *Id*. at 612-613. This is true because

> "[w]hen that information is withheld, the suspect's waiver of the right to counsel and to remain silent is more abstract than real, becoming, in effect, a waiver of a theoretical right that is uninformed by the material knowledge that retained counsel, present and available to assist the suspect in the full exercise of his or her rights, is just outside the door." [*Id*. at 612 n 16, quoting *State v Reed*, 133 NJ 237, 274; 627 A2d 630 (1993).]

Stated differently, I am

> "unwilling . . . to dismiss counsel's effort to communicate as constitutionally insignificant to the capacity of the suspect to make a knowing and intelligent choice whether he or she will invoke the right to counsel. *Miranda* warnings refer only to an abstract right to counsel. That a suspect validly waives the presence of counsel only means that for the moment the suspect is foregoing the exercise of that conceptual privilege.

16

Faced with a concrete offer of assistance, however, a suspect may well decide to reclaim his or her continuing right to legal assistance. To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second. We cannot therefore conclude that a decision to forego the abstract offer contained in *Miranda* embodies an implied rejection of a specific opportunity to confer with a known lawyer." [*Bender*, 452 Mich at 612 n 16 (opinion by CAVANAGH, J.), quoting *State v Stoddard*, 206 Conn 157, 168; 537 A2d 446 (1988) (quotation marks omitted).]

Finally, in response to today's majority, I reiterate my response to the *Bender* dissent's assertion that the Michigan Constitution's privilege against self-incrimination provides no greater protection than the Fifth Amendment: "when interpreting art 1, § 17, there is an absence of a direct link to federal interpretation of the Fifth Amendment. Thus, it does not logically follow that in interpreting art 1, § 17, we must find compelling reasons to interpret our constitution more liberally than the federal constitution." *Bender*, 452 Mich at 613 n 17 (opinion by CAVANAGH, J.). Rather, this Court must conduct a searching examination to discover what law the people of this state have made. *Id*.

I also note that Justice BRICKLEY'S dissent in *Sexton*, 458 Mich at 69-70 (BRICKLEY, J., dissenting), and my opinion in *Bender*, 452 Mich at 611-612 (opinion by CAVANAGH, J.), cited the plurality opinions in *Wright*. Thus, although no opinion in *Wright* garnered majority support, *Wright* provides further insight into the constitutional basis for the *Bender* rule.

In *Wright*, Justice MALLETT, joined by Justice LEVIN, explained that "[u]nder Const 1963, art 1, § 17, a criminal suspect is given the right against self-incrimination, a right *similar* to that provided in the Fifth Amendment of the United States Constitution."

*Wright*, 441 Mich at 154 (opinion by MALLETT, J.) (emphasis added). Thus, Justice MALLETT recognized that the right against self-incrimination under the Michigan Constitution is not necessarily exactly the same as the "similar" right under the federal Constitution merely because the language of the two Constitutions is nearly the same. Rather, the state right may be broader. Indeed, Justice MALLETT concluded just that when he explained that the defendant's "confession, made without [knowledge of his attorney's efforts to speak to him], violated the rights afforded *under the Michigan Constitution*." *Id*. at 155 (emphasis added).

I concurred with Justice MALLETT'S conclusion that the privilege against self-incrimination under the Michigan Constitution is broader than the privilege under the United States Supreme Court's interpretation of the Fifth Amendment. *Wright*, 441 Mich at 155-156 (opinion by CAVANAGH, C.J.). I provided further support for that conclusion by noting that, as far back as 1929, this Court had determined that the privilege against self-incrimination under the state Constitution made it unlawful for police to deny an attorney access to his client. *Id*. at 157-158, citing *Cavanaugh*, 246 Mich 680. Finally, Justice BRICKLEY also authored a concurring opinion in *Wright*, emphasizing the holding in *Cavanaugh* in support of the conclusion that the Michigan Constitution provides a broader privilege against self-incrimination than the federal Constitution. *Wright*, 441 Mich at 168 (opinion by BRICKLEY, J.), citing *Cavanaugh*, 246 Mich 680.

Therefore, after tracing the rule prohibiting the police from denying an attorney access to a client undergoing police interrogation from *Bender* back to *Wright*, it is clear that although there has not always been majority support for a single view, the justices in

18

support of the *Bender* rule rooted their analysis in the Michigan Constitution. Moreover, those justices necessarily relied on *Cavanaugh* (as evidenced by the *Bender* opinions' citations of the *Wright* opinions, which cited *Cavanaugh*) as the primary source for the broader interpretation of the right against self-incrimination under the Michigan Constitution.[7]

By rejecting *Bender* on the grounds that it lacks moorings in the Michigan Constitution, the majority erroneously adopts a "literal application" of Const 1963 art 1, § 17, and "ignore[s] the jurisprudential history of this Court" embodied in *Cavanaugh* and continued in *Wright* and *Bender* "in favor of the analysis of the United States Supreme Court . . . ." *Sitz v Dep't of State Police*, 443 Mich 744, 758; 506 NW2d 209 (1993). In doing so, the majority "disregard[s] the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has . . . not extended such protection." *Id*. at 759.

---

[7] The majority rejects this conclusion, positing that "this Court did not rely on *Cavanaugh* for the proposition that the compulsory self-incrimination provision contained in Article 1, § 17 provides protections that extend beyond those afforded by the Fifth Amendment." However, in the same breath, the majority concedes that my opinion in *Wright* cited *Cavanaugh* for the premise that a violation of the protections that are now contained in art 1, § 17 occurs when the police conceal from a suspect that counsel has been made available to him. See *Wright*, 441 Mich at 157-158 (opinion by CAVANAGH, C.J.). Moreover, *Bender* cited *Wright* for support. See, e.g., *Bender*, 452 Mich at 611-612 (opinion by CAVANAGH, J.). Accordingly, the majority is misguided in its interpretation of *Cavanaugh*'s effect on the analysis in *Wright* and *Bender*.

## IV. ADDITIONAL AND INDEPENDENT SUPPORT FOR *BENDER* IN THE MICHIGAN CONSTITUTION

Although I believe that art 1, § 17 of our Constitution fully supports *Bender*, as I explained in *Wright*, 441 Mich at 156-157 (opinion by CAVANAGH, C.J.), a rule prohibiting police efforts to deprive a suspect of the knowledge that his lawyer is attempting to contact him is also alternatively supported by art 1, § 20.[8] See, also, *Bender*, 452 Mich at 611 n 14 (opinion by CAVANAGH, J.) (citing *Wright* for the conclusion that "Const 1963, art 1, § 20 . . . supported suppression of the defendant's statement").

"There is some overlap between the privilege against self-incrimination . . . and the right to counsel;" however, " 'the right to counsel cases are concerned with the integrity of the adversarial process.' " *Wright*, 441 Mich at 156 n 2 (opinion by CAVANAGH, C.J.), quoting Loewy, *Police-Obtained Evidence and the Constitution: Distinguishing Unconstitutionally Obtained Evidence from Unconstitutionally Used Evidence*, 87 Mich L Rev 907, 928 (1989). As I stated in *Wright*, 441 Mich at 156 n 2 (opinion by CAVANAGH, C.J.), I believe that permitting police to frustrate counsel's efforts to communicate with a suspect "threatens the adversarial system by allowing the police to manipulate the interrogation process," which is particularly problematic in Michigan, given that under the decision of a majority of this Court in *People v Cipriano*, 431 Mich 315; 429 NW2d 781 (1988), police can purposely delay a suspect's

---

[8] Const 1963, art 1, § 20 states, in relevant part, "[i]n every criminal prosecution, the accused shall have the right to . . . have the assistance of counsel for his or her defense . . . ."

20

arraignment. In my view, the majority today exacerbates the errors in *Cipriano* by sanctioning police efforts during that prearraignment period to obstruct a lawyer's attempts to contact and advise his client, and to keep the suspect in the dark about the lawyer's attempts.

*Kirby v Illinois*, 406 US 682, 688; 92 S Ct 1877; 32 L Ed 2d 411 (1972), established the federal limitation on when the right to counsel attaches: the right attaches "only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby* further stated that, as an example, the right attaches "at the time of arraignment . . . ." *Id*. However, in Michigan, the federal limitation was at least partially rejected in *People v Anderson*, 389 Mich 155; 205 NW2d 461 (1973), and *People v Jackson*, 391 Mich 323, 338; 217 NW2d 22 (1974) (stating that "independent of any Federal constitutional mandate, . . . both before and after commencement of the judicial phase of a prosecution, a suspect is entitled to be represented by counsel at a corporeal identification or a photographic identification").[9] Therefore, "[a]lthough *Jackson* and *Anderson* were not explicitly premised on either the Sixth Amendment or Const 1963, art 1, § 20, they support the view that prearraignment events can trigger our state constitutional right to counsel." *Wright*, 441 Mich at 159-160 (opinion by CAVANAGH, C.J.).

---

[9] I recognize that, in *People v Hickman*, 470 Mich 602; 684 NW2d 267 (2004), a majority of this Court overruled *Anderson* and its progeny, including *Jackson*. However, I continue to believe that this Court erred when it overruled *Anderson* for the reasons stated in Justice MARILYN KELLY's dissent in *Hickman*. *Id*. at 611-621 (MARILYN KELLY, J., dissenting).

I continue to believe that *Jackson*'s and *Anderson*'s rejection of the *Kirby* restriction is proper because the *Kirby* restriction is arbitrary. Specifically, as explained in *Patterson v Illinois*, 487 US 285, 290 n 3; 108 S Ct 2389, 101 L Ed 2d 261 (1988), post-indictment *Miranda* waivers are sufficient only until an actual attorney-client relationship is established and nothing changes at the time of formal charging if there was no attorney-client relationship yet established. Thus, "[t]he converse must also hold true: If an attorney-client relationship exists before arraignment, nothing will change at the time of arraignment to cause the right to counsel to suddenly blossom where none existed before." *Wright*, 441 Mich at 160 (opinion by CAVANAGH, C.J.). Accordingly, *Anderson* and *Jackson* correctly recognized that there are "critical stages" in prosecution that can occur before formal charging. I continue to believe that "custodial interrogation of an accused who is represented by counsel is just such a situation." *Id*. at 160-161. Moreover, in my view, "the police can be held accountable for knowing that the accused is represented by counsel 'to the extent that the attorney or the suspect informs the police of the representation.' " *Id*. at 161, quoting *Moran*, 475 US at 460 n 46 (Stevens, J., dissenting).

Accordingly, because I believe that a suspect "faced with custodial interrogation has the *specific* right, as part of his overall right to counsel, to be informed of his attorney's attempts to contact him," I would hold that "a waiver of that right cannot be valid when the police merely inform the suspect, in generalized terms, that he has the right to a lawyer if he wishes." *Wright*, 441 Mich at 161 n 5 (opinion by CAVANAGH, C.J.). Simply stated, "[a] defendant cannot knowingly and intelligently waive his *specific*

right to speak with an attorney who is immediately available and trying to contact him when he is unaware that the attorney *is* available and trying to contact him." *Id*. Instead, in my view, "the waiver can only be valid if the suspect is timely and accurately informed of his attorney's immediate availability and attempts to contact him, and *then* knowingly, intelligently, and voluntarily waives the right to see the attorney." *Id*.

In summary, contrary to the majority's conclusion that *Bender* lacks any connection to the Michigan Constitution, our caselaw establishes that *Bender* is firmly rooted in art 1, § 17. Accordingly, *Bender* was properly decided and should not be overruled. Moreover, in my view, *Bender* is also supported by the right to counsel under art 1, § 20.

## V. STARE DECISIS

In light of the preceding analysis, it is clear that *Bender* is founded on the Michigan Constitution and is consistent with this Court's prior precedent. *Bender* was correctly decided and no further stare decisis consideration is needed. However, even accepting the majority's faulty conclusion that *Bender* was wrongly decided, I do not agree that its decision to overrule *Bender* is supported by stare decisis principles.

The United States Supreme Court has explained that the doctrine of stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v Tennessee*, 501 US 808, 827; 111 S Ct 2597; 115 L Ed 2d 720 (1991). Our longstanding doctrine of stare decisis provides that "principles of law deliberately examined and decided by a court of competent jurisdiction should not be

23

lightly departed." *Brown v Manistee Co Rd Comm*, 452 Mich 354, 365; 550 NW2d 215 (1996) (quotation marks and citations omitted), overruled in part on other grounds by *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197; 731 NW2d 41 (2007). As a result, "a stare decisis analysis should always begin with the presumption that upholding the precedent involved is the preferred course of action." *Petersen v Magna Corp*, 484 Mich 300, 317; 773 NW2d 564 (2009) (opinion by MARILYN KELLY, C.J.). Thus, "overturning precedent requires more than a mere belief that a case was wrongly decided," *McCormick v Carrier*, 487 Mich 180, 211; 795 NW2d 517 (2010), and the presumption in favor of upholding precedent "should be retained until effectively rebutted by the conclusion that a compelling justification exists to overturn the precedent." *Petersen*, 484 Mich at 317 (opinion by MARILYN KELLY, C.J.).

Moreover, when our caselaw concludes that the Michigan Constitution provides greater protection to our citizens than that provided by the federal Constitution, I believe "this Court should be required to show a compelling reason to depart from [that] past precedent." *Goldston*, 470 Mich at 559 (CAVANAGH, J., dissenting), citing *People v Collins*, 438 Mich 8, 50; 475 NW2d 684 (1991) (CAVANAGH, C.J., dissenting).

Several of the criteria discussed in *Petersen*[10] weigh in favor of upholding *Bender* rather than overruling it: (1) *Bender* provides a practical and workable rule; (2) facts and

---

[10] In *Petersen*, Chief Justice MARILYN KELLY provided a nonexhaustive list of criteria for consideration when a court engages in a stare decisis analysis, but no single criterion is determinative, and a given criterion need only be evaluated if relevant. *Petersen*, 484 Mich at 320 (opinion by MARILYN KELLY, C.J.). By expanding on the test from *Robinson v Detroit*, 462 Mich 439, 464; 613 NW2d 307 (2000), which the majority applies, *Petersen*'s test is also more respectful of precedent than *Robinson*.

24

circumstances have not changed, or come to be seen so differently, as to have robbed *Bender* of significant application or justification; (3) other jurisdictions have adopted rules similar to *Bender* that are more protective of the privilege against self-incrimination than the federal rule; and (4) overruling *Bender* is likely to result in serious detriment prejudicial to public interests. See *Petersen*, 484 Mich at 320 (opinion by MARILYN KELLY, C.J.).

*Bender*'s per se rule prohibiting police interference with counsel's efforts to communicate with a suspect is easily understood by the police and creates little, if any, uncertainty regarding what is required: the police must inform a suspect that counsel has been retained for him and is attempting to contact him. *Bender*, 452 Mich at 620 (opinion by CAVANAGH, J.). See, also, *Wright*, 441 Mich at 163-164 (opinion by CAVANAGH, C.J.) (stating that "if an attorney takes diligent steps to inform the police that he represents and wishes to contact a suspect held in custody, the police must take prompt and diligent steps to inform the suspect of that fact"). Accordingly, as even the majority admits, *Bender* provides a practical and workable rule. See *ante* at 49-50. This factor therefore weighs heavily in favor of upholding *Bender*.

Nevertheless, the majority inexplicably applies an approach that merely pays lip service to the obvious practical workability of *Bender* while primarily considering whether a regime other than the *Bender* rule might be equally workable. A stare decisis analysis focuses on the *established rule's* workability; not whether some other rule may or may not be applied as easily as the established rule. See *Petersen*, 484 Mich at 320 (opinion of MARILYN KELLY, C.J.) (considering "whether *the rule* has proven to be intolerable because it defies practical workability") (emphasis added); and *Robinson*, 462

25

Mich at 464 (considering "whether *the decision at issue* [i.e., the established rule] defies 'practical workability' ") (emphasis added). That focus on the established rule is consistent with the understanding that upholding the precedent involved is "the preferred course, because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Hohn v United States*, 524 US 236, 251; 118 S Ct 1969; 141 L Ed 2d 242 (1998) (citation and quotation marks omitted). See, also, *Petersen*, 484 Mich at 317 (opinion by MARILYN KELLY, C.J.). The majority's faulty stare decisis analysis features its attempt to manipulate this factor with an approach that lacks any support in caselaw and all but ignores the practical workability of the existing rule.

Further supporting the conclusion that *Bender* should not be overruled is the fact that circumstances have not come to be seen so differently as to have robbed *Bender* of significant justification. Indeed, protection of a citizen's constitutional rights within the custodial-interrogation setting remains as important today as it was when *Bender* was decided 18 years ago, as evidenced by this Court's and the United States Supreme Court's repeated consideration of the issue.

Moreover, many states have, as Michigan did in *Bender*, recognized that *Moran* merely establishes a minimum requirement and have determined that their citizens enjoy greater state constitutional protection than afforded by *Moran*.[11] As a result, *Bender* is

_____

[11] See, e.g., *Stoddard*, 206 Conn at 164-167 (declining to follow *Moran* based on state precedent interpreting the state constitution); *Bryan v State*, 571 A2d 170, 176-177 (Del, 1990) (same); *Commonwealth v Mavredakis*, 430 Mass 848, 858-860; 725 NE2d 169

26

far from unique in concluding that state law provides greater constitutional protections than the federal Constitution regarding the privilege against self-incrimination. Although I recognize that some states have adopted *Moran* as consistent with the protections provided by their state Constitutions, the fact that the states are divided on the issue at most renders this factor neutral.

Finally, in my view, the most significant factor in favor of upholding *Bender* is that the majority's contrary decision is likely to result in serious detriment prejudicial to public interests. The majority disagrees, claiming that "[i]t is hard to comprehend a societal interest that is furthered by protecting persons who have engaged in serious criminal activities from the consequences of their own voluntary and intelligent decisions." *Ante* at 52. To begin with, this statement entirely ignores the overriding principle of our criminal justice system: that a suspect is presumed innocent until proven guilty beyond a reasonable doubt. Thus, whether there is a "societal interest" in protecting any particular conduct of a person who has "engaged in serious criminal activities" is entirely irrelevant. However, in my view, the "societal interest" in

---

(2000) (same); *State v Roache*, 148 NH 45, 49-51; 803 A2d 572 (2002) (same); *People v McCauley*, 163 Ill 2d 414, 423-425; 206 Ill Dec 671; 645 NE2d 923 (1994) (same); *State v Simonsen*, 319 Or 510, 514-518; 878 P2d 409 (1994) (same); *Roeder v State*, 768 SW2d 745, 753-754 (Tex App Ct, 1988) (same); *Reed*, 133 NJ at 250 (declining to follow *Moran* in light of state statutory and common law); *Haliburton v State*, 514 So 2d 1088, 1090 (Fla, 1987) (declining to follow *Moran* and finding a violation of the Due Process Clause of the Florida Constitution); and *West v Commonwealth*, 887 SW2d 338, 342-343 (Ky, 1994) (declining to follow *Moran* because the Kentucky Constitution provides greater protection than the federal Constitution and a state criminal rule providing access to counsel predating *Moran* remained applicable). See, also, *Reed*, 133 NJ at 265 (noting that "[p]rior to *Moran*, a majority of states followed a rule similar to" *Bender*).

protecting the ability of those *merely accused* of a crime to make a truly "knowing and intelligent" waiver of their constitutional rights is of the highest order. Moreover, "if law enforcement officers adhere to [*Bender*], there will be no reversal of convictions on the basis of failure by officers to inform the suspect that his counsel wished to speak with him before he made a confession." *Bender*, 452 Mich at 597 n 1 (opinion by CAVANAGH, J.). Therefore, if a *Bender* violation occurs, "it will be a government agent, and not this Court, that is responsible for thwarting and hampering cases of urgent social concern . . . ." *Id*.

Moreover, I disagree with the majority's subjective and unsupported conclusion that *Bender* "impinge[s] on the effectiveness of law enforcement . . . ." *Ante* at 51. For starters, it does not appear that Michigan's law enforcement has suffered from a serious inability to effectively enforce the law in the 18 years since *Bender* was decided.[12] Apparently, the many other states that have declined to follow *Moran* have likewise managed to avoid becoming lawless wastelands of crime, despite the majority's concern. See, also, *Moran*, 475 US at 460 (Stevens, J., dissenting) (stating that an argument similar to the majority's "is not supported by any reference to the experience in the states that have adopted" a rule similar to *Bender*), and *Goldston*, 470 Mich at 568-569

---

[12] The majority disagrees, arguing, "the negative effects of *Bender* are not obviously seen . . . ." *Ante* at 51 n 39. In my view, *Bender* protects our citizen's constitutional rights; accordingly, I cannot agree with the majority's conclusion that *Bender*'s effects are "negative." Likewise, the majority's recitation of the prosecution's protestations against *Bender* could apply with equal force to other constitutional protections afforded to criminal suspects. Nevertheless, we uphold these constitutional protections. We should do the same with *Bender* because the goal is justice through proper application of constitutional principles, not convictions at any cost.

28

(CAVANAGH, J., dissenting) (considering the similar concern of the majority in that case "that the high cost of the exclusionary rule exacts too great a toll on our justice system" and noting that "our state has managed to exist for decades with the exclusionary rule and our streets have yet to become teeming with criminals").

Although I think that the majority's concern that *Bender* unduly interferes with law enforcement is exaggerated, I am nevertheless aware that the *Bender* rule "may decrease the likelihood that interrogating officers will secure a confession." *Bender*, 452 Mich at 618 (opinion by CAVANAGH, J.). However, that cost must be balanced against the result of the majority's favored rule. "[P]olice deception of a suspect through omission of information regarding attorney communications greatly exacerbates the inherent problems of incommunicado interrogation . . . ." *Moran*, 475 US at 452 (Stevens, J., dissenting). Accordingly, while confessions "are not only a valid, but also an essential part of law enforcement," *Bender*, 452 Mich at 597 n 1 (opinion by CAVANAGH, J.), " '[t]he quality of a nation's civilization can be largely measured by the methods it uses in the enforcement of its criminal law.' " *Miranda*, 384 US at 480, quoting Schaefer, *Federalism and State Criminal Procedure*, 70 Harv L Rev 1, 26 (1956).

> No system worth preserving should have to fear that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, [his rights to remain silent and to counsel]. If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system. [*Escobedo v Illinois*, 378 US 478, 490; 84 S Ct 1758; 12 L Ed 2d 977 (1964).]

## VI.  CONCLUSION

*Bender* has stood undisturbed for nearly 20 years and has foundations as far back as 1929.  See *Cavanaugh*, 246 Mich 680.  Moreover, *Bender* correctly determined that art 1, § 17 of the Michigan Constitution provides Michigan's citizens greater protection than its federal counterpart.  That conclusion, in my view, is further supported by the Court's interpretation of art 1, § 20 of our Constitution.  Finally, the doctrine of stare decisis weighs against overruling *Bender*.  Accordingly, I dissent.

Michael F. Cavanagh

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v                                          No. 146211

GEORGE ROBERT TANNER,

      Defendant-Appellee.

_____

MCCORMACK, J. (*dissenting*).

      I respectfully dissent from the majority's decision to use this case as a vehicle for overruling *People v Bender*, 452 Mich 594; 551 NW2d 71 (1996). While I agree with the majority that "stare decisis is a principle of policy rather than an inexorable command," I do not find adequate reason to depart from the "preferred course" of leaving *Bender*'s settled precedent intact. *Robinson v Detroit*, 462 Mich 439, 463-464; 613 NW2d 307 (2000) (internal quotation marks omitted). First, I do not share the majority's confidence that the rule recognized in *Bender* lacks a constitutional basis. Rather, I agree with Justice CAVANAGH that this rule is well moored in Article 1, § 17 of the Michigan Constitution, with its jurisprudential roots set in *People v Cavanaugh*, 246 Mich 680; 225 NW 501 (1929). I appreciate and, in certain respects, share the majority's dissatisfaction with *Bender*'s fractured treatment of this issue; none of the shortcomings I see in the opinion, however, are sufficient to undermine the substantive integrity of its conclusion or render it "wrongly decided."

Nor, in my mind, would any other consideration favor disruption of that precedent.[1] As Justice CAVANAGH aptly explains, in the nearly twenty years since *Bender* was decided, there has been no indication that its straightforward rule has defied practical workability in any respect, or has produced the "mischief" and harm of which the prosecution and majority warn.[2] Rather, by now removing this simple and settled rule, the majority works an undue detriment upon the constitutional protection long recognized by this Court and relied upon by the people of Michigan: that should they find themselves detained as suspects of a crime, they will not be held incommunicado from those who have been retained or appointed to advise them. And I see no changes in the law or facts that render *Bender*'s recognition and implementation of this principle no

---

[1] Justice CAVANAGH applies *Petersen v Magna Corp*, 484 Mich 300, 317-320; 773 NW2d 564 (2009) (opinion by MARILYN KELLY, C.J.), to reach this same conclusion. While I do not likewise rely on that case or framework, I find that much of the substance of his reasoning applies with equal force under the governing standard set forth in *Robinson*. See *Robinson*, 462 Mich at 464 (explaining that, before this Court overrules a precedent it deems "wrongly decided," it "should also review whether the decision at issue defies 'practical workability,' whether reliance interests would work an undue hardship, and whether changes in the law or facts no longer justify the questioned decision").

[2] Indeed, I, like Justice CAVANAGH, have difficulty seeing how a rule requiring police to inform suspects of their counsel's availability might produce any sort of detriment with which our society should be duly concerned. I have even more difficulty with the majority's suggestion that such a rule might harm those suspects themselves, because "police officers and prosecutors will almost certainly be more reluctant to facilitate counsel before one is legally required if the consequence is the suppression of evidence." *Ante* at 45 n 37. It is, of course, the deliberate concealment of counsel, not the facilitation of it, that merits suppression under *Bender*. *Bender*'s rule would thus only discourage the police and prosecution from assisting in the procurement of counsel if they planned to withhold that counsel from the suspect—which would be a peculiar form of "facilitation" from the suspect's perspective, to say the least, and one not likely to be missed.

longer justified. To the contrary, our current debate over the propriety of that rule simply echoes the one taken up by the *Bender* Court years ago; its contours have remained the same, as have the arguments and authority offered by each side in support. The Justices involved have changed (for the most part), but of course that does not warrant disturbance of our precedent.

I do, however, see one meaningful difference between the instant case and *Bender*, and it too counsels against the majority's chosen course. As the majority stresses, there was no dispute in *Bender* that the defendants made their incriminating statements to the police without requesting or even expressing interest in securing the representation of counsel beforehand. Nonetheless, those statements were suppressed because the police did not inform the defendants of the counsel that their parents had unilaterally decided to retain for them. This fact animated the *Bender* dissent's chief objections to that decision's per se rule, shared by the majority here: that it permits suppression of confessions based strictly on circumstances beyond the cognizance and apparent concern of the suspect, the individual to whom the constitutional rights at issue belong. *See Bender*, 452 Mich at 649-650, 656 (BOYLE, J., dissenting).

The instant case, however, is not *Bender*, and these concerns are not implicated. For, unlike the defendants in *Bender*, the defendant's incriminating statements in this case only came after he repeatedly expressed his desire for counsel but to no avail. The first request came when the defendant was initially taken into custody on the morning of October 17, 2011. Upon being read his rights, the defendant indicated that he would not waive them and requested that counsel be provided to him. The interrogating detectives acknowledged the request but nonetheless continued to press him into talking; the

3

defendant, however, again asserted his right to counsel, reiterating, "I would like a lawyer for consultation." The defendant was then returned to lock-up, and heard nothing further regarding his requests. His next request came the following day, when the jail administrator came to see the defendant in response to his statement to a mental health worker that he "had some things he wanted to get off of his chest." When the administrator asked if the defendant "want[ed] to talk to somebody," the defendant said yes, and asked, "[C]an you get me an attorney?" After telling the defendant that procuring an attorney was not his job, the administrator offered to get the detectives instead—the same ones from whom the defendant had already requested counsel. The defendant acquiesced. The defendant's interest in the assistance of counsel was sufficiently clear at this time that the jail administrator and police contacted the county prosecutor, who arranged for counsel to be appointed and sent to the jail. Nonetheless, at no point during his custody was the defendant given any indication that his rightful requests for counsel would ever, in fact, be honored, regardless of whom or how often he asked—let alone that such counsel had been appointed and was readily available to assist him.

It was under these circumstances that the defendant's waiver of rights and incriminating statements were made. The defendant stressed these circumstances in arguing for suppression,[3] and they, in turn, drove the trial court's determination to that effect:

---

[3] The majority notes that defense counsel conceded before the trial court that the defendant's eventual waiver of his *Miranda* rights was "made voluntarily." It is entirely clear, however, that counsel did not intend this concession to suggest that the defendant's

4

Given these facts, the attorney was there, the police knew it, he was not permitted to go back and see his client. . . . [The defendant], who had once invoked his right to remain silent and had indicated at least on the 18th with knowledge to the police officials that he might possibly be interested in an attorney, was not told that one was there waiting for him. Based upon that, I will grant the motion of the Defendant to suppress [his] confession . . . .[4]

---

unrequited requests for counsel bore no improper influence over his subsequent waiver and confession; rather, counsel consistently emphasized these requests and how they made suppression all the more warranted here than in *Bender*—a proposition, as discussed below, with which the trial court appeared to agree. See Defendant's Brief in Support of Motion to Suppress Statement (explaining that, unlike in *Bender,* the defendant here invoked his right to counsel, "mak[ing] the police officers['] actions of not informing the Defendant that an attorney had been appointed to represent him and was present at the jail when they gave him *Miranda* rights, all the more curious"); Evidentiary Hearing Closing Argument by Defense Counsel (stressing at the outset of his closing argument in favor of suppression that "once [the defendant] invoked his right to an attorney he never really received a benefit from it"; arguing further that the defendant's "case is even stronger than" *Bender* because, *inter alia*, when the prosecutor was contacted, resulting in appointment of counsel, "it's uncontested that there was a request for a lawyer"; and questioning the prosecution's suggestion that appointed counsel "was only on standby," to be made available only "if [the defendant] guessed after asking for a lawyer twice that somehow one would be there for him").

[4] Accordingly, I cannot agree with the majority's characterization of the trial court's ruling as simply that the "defendant's statement required suppression under *Bender*, because the police officers had failed to inform him that an attorney was present at the jail and had established contact with the officers." *Ante* at 4. While this failure was certainly enough in itself to warrant suppression under *Bender*, it is apparent that the trial court also found significant that this failure came in the face of the defendant's repeated requests for counsel. Similarly, the majority states that the trial court ruled that the defendant "affirmatively reinitiated contact with police officers on October 18, 2011, without reasserting his right to counsel." *Ante* at 4. While the majority may be comfortable with that conclusion, I see no determination by the trial court to that effect. Rather, the court recognized, as described above, that the jail administrator came to speak with the defendant upon hearing of his desire to "get something off [his] chest"; "the first thing that [the defendant] brings up is he asked if [he] could get an attorney"; the administrator declined and offered to get the detectives instead; and the defendant "seemed to understand that and was agreeable for him to get the detectives." Nor, given these circumstances, did the trial court put much stock in the prosecution's "no good deed goes unpunished" lament—echoed by the majority here—that counsel's appointment was

Both the defendant and the trial court focused on *Bender* as the legal basis for this conclusion, and fairly so, as its settled and straightforward rule plainly sweeps these circumstances within its scope.  The defendant's frustrated attempts to invoke his right to counsel, however, just as plainly implicate *Cavanaugh*, which sits at the core of *Bender*'s rule and persists wholly intact without it.  Taking *Bender* off the books thus does little to resolve the actual evidentiary question at issue in this case: whether the defendant's statements should be suppressed on constitutional grounds.[5]  *Bender*'s rule, while

---

simply a precautionary measure, voluntarily undertaken and wholly conditional upon whether the defendant (yet again) asked for it.  Instead, the court stressed that, although the detective, "and I'm not picking on him, . . . talks about [the attorney] being there only if needed," there was no confusion among the detectives and the jail administrator that the attorney had been sent for the defendant, and the attorney, while perhaps unsure of the defendant's name at that time, "knew he was there to talk to somebody and represent them regarding possible charges of murder or homicide that would be filed . . . against them."

[5] Despite their prominence in both the defendant's arguments and the trial court's ruling, the majority pays little mind to the defendant's requests for counsel, summarily suggesting that they were constitutionally meaningless and left the defendant here no differently situated than the defendants in *Bender*.  The majority even holds this case out as emblematic of "the problems with *Bender*," as "the prosecutor, on behalf of the people, was effectively sanctioned by the suppression of defendant's voluntary statements for having taken the precaution of seeking out counsel in the event that defendant requested counsel before or during his interrogation."  *Ante* at 45 n 37.  I, like the trial court, cannot so easily disregard the defendant's requests for counsel.  The record here paints a substantially different and more complicated picture than the one now offered by the majority—one in which counsel was procured because, indeed, the defendant affirmatively desired and repeatedly asked for it, and in which the prosecution and police have been "sanctioned" not for acknowledging those requests, but for failing to duly honor them.  The trial court saw significance in these complications; in light of its due reliance on *Bender*, however, it was not required to take up the full range of their constitutional import.  With *Bender* now gone, I would leave that assessment to the trial court in the first instance, if and when the defendant again seeks suppression of his statements on a constitutional basis, state or federal, that demands it.

6

certainly sufficient to sustain this relief, is not necessary to it. The majority may disapprove of that rule, but *Bender* is not the case before us, and I fail to see how the instant case invites or enables the majority to act on that disapproval as they have. Accordingly, I cannot join in the majority's decision to reach beyond the facts of this case to overrule *Bender*'s settled and sound precedent.

Bridget M. McCormack

7